Argued April 19, affirmed in part; reversed
in part and remanded June 18, reconsideration
denied September 6, 1979

STATE OF OREGON, *Respondent,*
*v.*
JEFFREY JOSEPH O'KEEFE, *Appellant.*
(Nos. 78-1066, 78-1203,
78-1204, 78-1507,
78-1508, 78-1509,
78-1510, CA    11744-11750, inclusive)

596 P2d 987

[686]

James E. Mountain, Jr., Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Catherine Allan, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton, Buttler and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Defendant appeals the judgments on his convictions of criminal activity in drugs (former ORS 167.207), two counts of robbery in the first degree (ORS 164.415), three counts of burglary in the first degree (ORS 164.215) and burglary in the second degree (ORS 164.225). The charges were tried to the court on stipulated facts after the denial of defendant's motion to suppress statements he had made while in custody and evidence seized from his car and house. Defendant raises six assignments of error.

### The Facts

■ The evidence adduced at the hearing on the motion to suppress was conflicting in several material respects. Under *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968), and *State v. Warner,* 284 Or 133, 585 P2d 674 (1978), we accept a trial court's findings of "what actually transpired"[1] where there is some evidence to support them and we resolve any other conflicts with respect to such "historical facts"[2] in the manner which supports the court's ruling. Applying those principles, the facts are as follows:

On February 12, 1978, at 12:25 a.m., Officer Kearns saw an automobile in the parking lot of a hardware store in Springfield. He noted that the car was similar to one reported to have been involved in some recent "incidents" in the area. Kearns was responding to another call, so he radioed the dispatcher and asked that another officer be sent to investigate. No other officer was available. Four minutes later, Kearns was advised by radio that a burglar alarm had been set off at the hardware store. He went to the store and found that a glass door and a glass gun case inside the store had been broken and several handguns had been taken.

---

[1] *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968).

[2] *Id.*

At approximately 12:30 a.m., another patrol officer, Sundby, received a report of Kearns' description of the car. About three hours later he received a report of a robbery at a variety store in Eugene and a description of a suspect: six feet one or two inches tall, of medium build with straight, shoulder length brown hair, wearing blue jeans, a blue ski cap and "mirror type" sunglasses. No mention was made of a car.

At 3:50 a.m., Sundby saw a car the same color and make as the one Kearns had described. The car was speeding down a Springfield street. It had no license plate light. The driver made an improper turn. Sundby stopped the car. As he approached the driver (defendant), he saw two blue ski caps and a pair of sunglasses in the back seat and noted that the driver fit the description of the variety store robbery suspect. He detected a strong odor of alcohol on defendant's breath and saw that his balance was impaired. He frisked defendant, handcuffed him and placed him in his patrol car. At some point Sundby noticed that one of the low-beam headlights on the car was burned out, as had been reported by Kearns. The victim of the robbery was brought to the arrest scene. He was unable to make a positive identification of defendant as the robber, but he did identify the ski caps and sunglasses as similar to those the robber had worn.

Defendant was told that he was under arrest for driving under the influence of intoxicants, defective equipment and having no Oregon driver's license. He was taken to the city jail at about 4:45 a.m. Officer Sundby "offered" defendant a breathalyzer test, but he refused. It was Sundby's opinion that defendant was still under the influence at that time. Defendant was placed in an interview room. Officer King tried to get booking information from him and also concluded that defendant was under the influence. Defendant was belligerent toward King and said he did not want to talk. When King said he needed defendant's name and the place and date of his birth, defendant told him he was from California and worked in a mill there. Then

defendant got nasty again and said, "I'm not telling you shit." King left the room. He had asked no questions about the crimes of which defendant was suspected. At no time did defendant request an attorney.

Meanwhile, Sergeant Smith, who had been at the scene of the arrest and had subsequently consulted with a deputy district attorney, returned to the arrest scene. He seized the ski cap and the sunglasses and also a crowbar which was in plain view in defendant's car. He searched the car, found and seized a revolver (which was then confirmed to have come from the hardware store) and a beer bottle of the same brand as that reportedly taken in the variety store robbery. After the search, the car was impounded.

When Smith returned to the jail, he tried to talk to defendant to assess his condition. He asked defendant where and with whom he lived. Defendant told Smith to "go get fucked." The state conceded that was an adequate invocation of defendant's right to remain silent. Smith concluded that defendant was intoxicated and that further questioning would be futile, so he left. Again defendant did not request an attorney.

The booking process was completed. When officers took defendant's palm print, he said "It's a clean print, I always wore gloves." Defendant asked to make a phone call and was allowed to do so.

Sometime between 4:30 and 5:30 a.m., several police officers were sent to keep an eye on defendant's residence. A while later they were directed to "secure" the residence until a search warrant could be executed. At approximately 7:41 a.m., Kearns and three other officers knocked on the door and were allowed in. They walked through the house, gathered all the occupants in the living room and kept them there until the warrant arrived. (The episode is described more fully in *State v. Ward,* 37 Or App 591, 588 P2d 72 (1978); *opinion withdrawn and conviction affirmed,* 38 Or

App 425, 590 P2d 296 (1979). Ward was an occupant of the house who was later arrested for being an ex-convict in possession of a concealable firearm.) The securing officers reported that several Budweiser beer bottles—the brand reportedly taken from the variety store— were scattered about the house. A warrant was issued for a search of the house. Included in the supporting affidavit was the reported observation of the beer bottles. The officers found and seized several incriminating items from the house.

At approximately 8:00 that evening, defendant was taken by Sergeant Smith from his cell to an office. Smith advised him of his *Miranda* rights, and defendant said he understood them. He appeared coherent and was no longer under the influence. He conceded at the hearing that he had understood his rights. Smith told defendant of the incriminating evidence that had been found in his car and house. He also told defendant that Jeffrey Ward had been arrested. Defendant then confessed to several crimes and repeated the confessions on tape for an officer named Ashbridge. At no time did defendant ask for an attorney or attempt to cut off the questioning.

## In-Custody Statements

Defendant argues that the court erred in refusing to suppress the statements made at the jail on the evening of February 12 in response to questioning by Smith and Ashbridge. He relies primarily on *State v. Rodriguez,* 37 Or App 355, 587 P2d 487 (1978), *rev den* (1979). The facts in that case were as follows:

"When defendant was arrested, he was read his *Miranda* rights and placed in the officer's patrol car. In coarse but clear terms he invoked his right to remain silent. At no time did he request an attorney. The officer attempted several times to obtain from him his name, address and date of birth, but defendant vehemently refused to answer any questions. When they arrived at the booking facility, approximately three hours after the arrest, the officer again asked defendant for his name and address, which

were needed to fill out a 'custody report.' Defendant did not answer. The officer told him that he would not be released until the report had been completed, but that if he did give the necessary information he would be released on bail or on his own recognizance. Defendant then gave his name and address. When the officer started to ask for physical characteristics, such as height, defendant remarked: 'You guys don't have a case anyway.' The officer replied, 'I think you're wrong' and proceeded to itemize all the evidence which he felt pointed to defendant as the burglar. He mentioned in particular that possible fingerprints had been found at the point of entry, but he did not mention that the burglar had entered through a bathroom window.

"At the hearing on the motion the officer summarized what occurred next:

" 'I said, "Hey, if your prints are in there, that's it, it's all over as far as I'm personally concerned," and he said, "Maybe I was in there before," and I said, "Well, maybe you were, maybe you were there yesterday." I think I made a comment, "Well, you know, the fingerprints could be overladen," and something, and if the fingerprints were fresh, and that means he was there yesterday, and he said, "Maybe I was there yesterday," and he said "I went to the bathroom," or he said "Maybe I went to the bathroom." And I said, "Why?" ' "(Footnote omitted.) 37 Or App at 357-58.

We concluded:

"Defendant's stimulating remark to the officer was an irrelevant response to the officer's proper questions seeking routine identifying information; in context it seems to have amounted to the defendant's way of saying that even identifying information was being given only reluctantly. While the comment did 'invite' some sort of response, it was not a justification for the officer to detail the evidence (and the possible evidence) against defendant and to comment on it as he did. The officer should have known, even if he did not think of it in the irritation of the moment, that his comments were likely to result in responsive

[691]

statements by the defendant. A reference to incriminating evidence to see if the suspect will attempt to explain it away is the substantial equivalent of a direct question and is just as objectionable. *See Brewer v. Williams,* 430 US 387, 97 S Ct 1232, 51 L Ed 2d 424 (1977).

"Although it did not clearly indicate a knowing and voluntary waiver of his right to remain silent concerning matters other than the booking information, defendant's initial comment could fairly be said to have raised a question whether he desired to discuss the case. To resolve that question the officer could have asked defendant straightforwardly if he had changed his mind and wished to discuss the case. *State v. Dyke,* 19 Or App 705, 528 P2d 1073 (1974); *see also Nash v. Estelle,* 560 F2d 652 (5th Cir 1977). He did not do so. Under the circumstances we conclude that defendant's right to remain silent was not 'scrupulously honored.'" 37 Or App at 360-61.

■ When asked for booking information, the defendant here, as in *Rodriguez,* invoked his right to remain silent in "coarse but clear terms." Similarity between the two cases ends there. The two officers who questioned defendant in the morning both concluded that he was intoxicated. Neither of them attempted to ask him about the crimes of which he was suspected. Each left when defendant swore at him. Defendant was left alone in his cell for at least 12 hours. Sergeant Smith, who went to defendant's cell in the evening, testified that he no longer

"*** appeared to be under the influence of any kind of intoxicants. He appeared coherent. He was responsive. At that point he was cooperative, receptive to being talked to."

Under those circumstances it was not unreasonable to determine if defendant's receptiveness to discussion had changed.

After taking defendant from his cell to an office, Sergeant Smith informed defendant of his *Miranda* rights. He indicated that he understood them. The very terms of those warnings are the equivalent of

expressly asking a defendant if he is willing to talk to the police. Unlike the exchange in *Rodriguez,* that approach gave defendant a clear opportunity knowingly to choose whether to discuss the case. Defendant made no attempt to cut off questioning.

Defendant claims that Sergeant Smith acted improperly in telling him of the evidence which had been obtained against him during the day. We do not agree. The officers' testimony showed that not only had defendant been clearly warned of his rights just prior to the evidence disclosures but that he had also already shown a willingness at least to talk with the officers. [3]

We conclude that defendant's right to cut off questioning was "scrupulously honored," *Michigan v. Mosley,* 423 US 96, 103, 96 S Ct 321, 46 L Ed 2d 313 (1975), and that he knowingly and voluntarily waived his *Miranda rights.*

## Auto Search

■■ Defendant contends that the warrantless search of his car was in violation of his constitutional rights and that the items seized as a result of that search, *i.e.,* the items that were not in plain view, should have been suppressed. We do not agree. The police clearly had probable cause to believe that the car had been used in connection with both the burglary (it was seen at the store) and the robbery (defendant fitted the description of the robber and the ski caps and sunglasses were of the type used). They had probable cause to believe that the car contained other fruits, instrumentalities and/or evidence of those crimes, including at least one handgun. Under the circumstances, the failure to

---

[3] In addition to the testimony of Sergeant Smith, *supra,* p 8, Officer Ashbridge testified as follows:

"Q:   Did you ask the defendant if he—Did you or did Officer Smith ask the defendant if he wanted to talk to you?

"A:   He was talking with us. Sergeant Smith got him out of the cell. I was not present when he brought him into the office, but I didn't go back to the cell. He was talking with both of us."

obtain a warrant before searching the car was not unreasonable. *State v. Walden,* 15 Or App 259, 515 P2d 407 (1973), *rev den* (1974); *Chambers v. Maroney,* 399 US 42, 90 S Ct 1975, 26 L Ed 2d 419 (1970).

*Search Warrant*

Defendant next argues that Sergeant Smith's affidavit in support of the warrant to search the house was insufficient in four particulars. First, he claims that it was improperly based on evidence discovered as a result of the search of the car. We have concluded that the auto search was lawful.

Second, he argues that Smith's statement "That a records check revealed that Mr. O'Keefe lives at [a particular address]" was hearsay and was not an adequate basis for an independent determination by the magistrate, because the statement did not reveal the particular source of the information, the reliability of the source or the "age" of the information. A statement by a police officer that a records check has disclosed that a person lives at a certain address is sufficiently specific and reliable to support a warrant to search at that address if there is probable cause to believe that fruits, instrumentalities or evidence of a crime will be found at the person's residence.

Defendant argues as his third particular that the facts stated in the affidavit did not support a finding of probable cause to believe that any such items would be found at his residence. Several items which were taken from the hardware store and the variety store were not found in defendant's car. Because the location of his house and the time and place of his arrest were such that it would have been possible and logical for defendant to have dropped them off there, the residence was a reasonable place to search. *State v. Skinner,* 5 Or App 259, 483 P2d 87, *rev den* (1971), *cert den,* 406 US 973 (1972).

Defendant argues finally that the supporting affidavit contained information illegally obtained by the

[694]

officers who "secured" the house prior to execution of the warrant. Although it is true that the information that "numerous empty Budweiser bottles were found" was unlawfully obtained, *State v. Ward, supra,* the other information in the affidavit was clearly sufficient by itself for the issuance of the warrant. *State v. McManus,* 267 Or 238, 517 P2d 250 (1973).

## Motions for Judgments of Acquittal—Burglaries

■ ■ Defendant was charged with three counts of burglary in the first degree, the indictments alleging that he used a burglar's tool in each instance. Defendant admitted using a crowbar in two of the burglaries. In the third, however, the evidence was that he used a rock or brick. Under the principles announced in *State v. Reid,* 36 Or App 417, 585 P2d 411 (1978), a crowbar is a burglar's tool, because it is utilizable and designed for prying things, including windows and doors. The state concedes, on the other hand, that a rock or brick is not a burglar's tool.[4] The first degree burglary conviction in #1507 is therefore reversed, and the case is remanded for sentencing for burglary in the second degree.

## Motions for Judgment of Acquittal—Robberies

■ Defendant asserts that his two first degree robbery convictions should be reversed because the state produced no direct evidence that the guns used were loaded. Direct evidence was not required, and there

---

[4] The state argues that we should not consider the issue whether a rock or brick is a burglar's tool under *State v. Reid,* 36 Or App 417, 585 P2d 411 (1978), because that particular issue was not raised below. That was also true in *Reid,* however, and we did consider the issue. We noted:

"Ordinarily we decline to consider on appeal issues not raised in the trial court. However, in this instance, since we conclude a prior controlling decision of this court was in error and must be overruled, we will consider the claim of error." 36 Or App at 423-24.

Although *Reid* accomplished the overruling of the prior decision, *State v. Cockrum, 14 Or App 431, 512 P2d 1373 (1973), that prior decision was controlling at the time of the trial in this case. In Cockrum* a piece of concrete block was held to be a burglar's tool. We think it appropriate to consider defendant's claim of error.

was sufficient indirect proof. *State v. Vance,* 285 Or 383, 591 P2d 355 (1979).

## Restitution Recommendation

■ Defendant assigns as error the court's recommendation contained in the judgment order on the criminal activity in drugs (possession) conviction that as a condition of parole, defendant be required to pay restitution to the victim of that crime. Defendant correctly asserts that restitution would not be appropriate because there was no victim of that crime. The state concurs, but argues that the recommendation is not appealable. We agree. The court had no authority to determine the conditions of parole. That is the parole board's responsibility. The recommendation, even if appropriate, would have no binding effect on the board, and we have no authority to review such a recommendation.

We note, however, that the judge's comments suggest he intended to recommend restitution in connection with all convictions for which it would be appropriate. The inclusion of such a recommendation in the judgment order on the CAID charge was apparently inadvertent. In any event, the recommendation can have no binding effect.

The first degree burglary conviction in #1507 is reversed and remanded for resentencing for second degree burglary. The other convictions are affirmed.

Affirmed in part; reversed in part and remanded.