Argued and submitted April 25, affirmed August 29, reconsideration denied October 12, petition for review denied November 6, 1984 (298 Or 172)

## STATE OF OREGON,
*Respondent,*

*v.*

## DANIEL LEE HOLTERMAN,
*Appellant.*

### (82-716; CA A28038)

687 P2d 1097

David E. Groom, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Defendant appeals his convictions for aggravated murder and attempted aggravated murder. He was accused of shooting Darlene Birtch and of killing Joyce DePew with a shotgun in the course of robbing them at an illegal gambling establishment where the women worked as dealers. He was convicted of aggravated murder, felony murder, two counts of first degree robbery, attempted aggravated murder and attempted felony murder. Sentences were imposed only on the aggravated murder and attempted aggravated murder convictions.

Defendant contends that (1) the aggravated murder statute is vague and overbroad; (2) the trial court erred in admitting evidence of DePew's dying declaration; (3) he was arrested without probable cause and the resulting evidence should have been suppressed; (4) the trial court erred in excluding evidence he contends tended to show that another person committed the crimes; and (5) the sentences imposed are unconstitutional. We affirm.

■  Defendant moved to suppress various evidence resulting from his warrantless arrest on the ground that there was no probable cause to arrest him under ORS 133.310 and Article I, section 9, of the Oregon Constitution. We take the facts from the hearing on the motion to suppress. We are bound by the trial court's explicit findings of fact it there is evidence to support them, we resolve other conflicts in the manner which supports the court's ruling. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968); *State v. O'Keefe,* 40 Or App 685, 687, 596 P2d 987, *rev den* 288 Or 81 (1979).

In the early morning hours of September 3, 1982, Clackamas County Deputy Sheriff Bowen was dispatched to a house south of Canby. He arrived at approximately 3:42 a.m. and found Birtch lying on her stomach in the driveway, severely wounded and barely conscious. She told Bowen that she had been shot and that another woman had been shot and was at a nearby house. She said, "Dan the Jeweler shot me. He drives a truck for Safeway. He shot us because we were dealing cards and he had lost. * * * I drove over here to get help." Shortly thereafter, Sergeant Barnum of the Sheriff's Department arrived. Birtch told Barnum that she had been shot by "Dan the Jeweler Man." She could not give his full name.

Bowen remained with Birtch while Barnum went to find the other victim.

Barnum was joined by Lieutenant Vicars at the gambling house, nearby on Whiskey Hill Road. Inside they found DePew lying wounded on the floor. Barnum asked if she knew who did it, and she said, "Yes," but when he asked if she knew his full name she said, "No." Vicars testified that when Barnum asked if she knew who shot her, she said, "No. Dan." After it became too difficult for DePew to talk, Barnum asked her to raise her index finger once for yes and twice for no. When he asked her if "Dan the Jeweler Man" had shot her, she raised her finger once.

Meanwhile, Officer Pagano of the Canby Police Department, while on patrol, overheard a sheriff's department radio communication that there had been a shooting and that someone called "Dan the Jeweler Man," who worked for Safeway, was a suspect. Recognizing the nickname as defendant's, Pagano drove to defendant's home, where he saw the light on and defendant's black Fiat in the driveway. Pagano radioed Canby police officer Wallis for assistance, asking him to watch defendant's house while he drove to the crime scene. There, Pagano told Vicars that he knew "Dan the Jeweler Man" to be defendant. Wallis then radioed Pagano that the Fiat was leaving defendant's residence. Other law enforcement officers were contacted to assist, and the Fiat was stopped south of Oregon City. Defendant was ordered out of the car and handcuffed. Vicars asked him if he was Daniel Holterman, and when he replied that he was, Vicars ordered him arrested.

Defendant argues that there was no probable cause to arrest him, because there was not a sufficient basis to believe that "Dan the Jeweler Man" and he were the same person. Canby police officer Pagano testified how he knew of defendant.

"A    I used to be an investigator for the police department and I attended several crime intelligence meetings. His name was brought up several times, again and again, about being involved in jewelry and his going by Dan the Jeweler man. That he worked at Safeway, and I just know a lot of things about Mr. Holterman. He's been involved in working pawn shops, that he carried a sawed-off shotgun in his car. That he

carries a large amount of money with him. That's why he carried it and it was just common knowledge that he was Dan the Jewelry man and he worked at Safeway.

"Q Who was it common knowledge with?

"A Other investigators throughout Clackamas County, agencies throughout."

■ The evidence supports the finding that Lieutenant Vicars, who ordered the arrest, had information that defendant was known to local law enforcement officials as "Dan the Jeweler" or "Dan the Jeweler Man" and that he worked for Safeway. The two shooting victims had named their assailant as "Dan the Jeweler Man"; one had stated that he worked for Safeway. Defendant was known by the local police to carry a shotgun, the light in his residence was on at 3:30 in the morning, just after the shooting, and his car later left.[1] We conclude that there was probable cause to make the arrest. The police were entitled to rely on information about defendant's nickname and activities generally known in the law enforcement community. *State v. Cloman,* 254 Or 1, 456 P2d 67 (1969) (officer's knowledge of suspect's reputation as copper wire thief considered as factor in probable cause to arrest for theft of copper wire).

Defendant assigns as error the admission of testimony regarding alleged "dying declarations" of DePew. Under OEC 804(3)(b), the following is not excluded by the hearsay rule:

"A statement made by a declarant while believing that death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death."

Defendant does not contend that DePew's statements fail to meet the requirements of the dying declaration exception to the hearsay rule. He concedes that DePew knew she was dying. He argues, however, that there was insufficient proof that DePew understood the hand signal system well enough to communicate and that Barnum's questions were suggestive. At the hearing on the motion to limit evidence, Barnum described the communication procedure utilized:

---

[1] Defendant also argues that the police had no information that it was defendant who was leaving in the Fiat and who was followed to Oregon City. Defendant did not raise this argument below, and we do not consider it now.

"A   I told her at that time to respond to me with a movement of her right index finger, and I asked her if she understood what I was saying. I said, 'If you do, raise your finger once for yes and raise your finger twice for no.' At that time she raised her finger once, indicating that she understood what I was trying to convey to her.

"Q   How soon after you asked her to raise her right index finger once if she understood did she in fact raise her right index finger once.

"A   Just immediately after. She just raised it slowly but it was a definite raise. It wasn't a jerky motion.

"Q   How long after you asked her that question did she raise her right index finger?

"A   Immediately.

"Q   What again did you ask her?

"A   I asked her if she knew the name of the person that shot her as Dan the Jeweler man, the person that shot her and Darlene, and at that time she raised her right index finger again only once.

"Q   How soon after you asked her that question did she raise her right index finger once?

"A   Immediately, and I asked her again if she was certain of the street name of that individual and again she raised her finger just once.

"Q   And how soon after you asked her that question did she raise her right index finger once?

"A   Immediately."

DePew never raised a finger other than the right index finger and never raised it when he had not asked her a question. At one point she raised her finger twice to indicate "no," when he asked if she knew the full name of the person who shot her.

■■■■       The suggestiveness of the questions affects the credibility and weight to be given the testimony, not its admissibility. *See State v. Foot You,* 24 Or 61, 65-66, 32 P 1031, 33 P 537 (1893). As for the other argument, we agree with defendant that it is necessary that the declarant be able to comprehend the questions and respond, because dying declarations must be such that they would be admissible if the declarant were testifying. *State v. Foot You, supra.* This aspect of admissibility is essentially a question of competence of the

witness. *See* OEC 601. The determination whether a witness is competent to testify is generally for the court to determine. *See* Kirkpatrick, *Oregon Evidence* 207-209 (1982); *see also State v. Stich,* 5 Or App 511, 484 P2d 861, *rev den* (1971). The trial court did not err in concluding from the evidence that DePew understood the questions and was able to employ Barnum's signalling system.

Defendant also assigns as error the trial court's exclusion of evidence defendant claims tends to show that another person committed the crimes. He made an extensive offer of proof, after which the trial court ruled that the evidence was inadmissible because it was too speculative and created too great a risk of confusing the jury. The evidence relates to various organized illegal gambling activities in the Willamette Valley. Defendant's theory was that, because DePew knew a lot about organized illegal gambling and had associated with an undercover police officer, there was a "contract" out on her which had been fulfilled and made to look like a robbery. Defendant testified that Marvin Wood, a person involved in illegal gambling, told him that there was a $100,000 contract on one of two women working for him, who was "turning state's evidence," "one of the women that got involved in this deal here." Defendant said that Wood asked him to make the payoff to the person accepting the contract, but defendant did not want to get involved.

The evidence defendant emphasizes in his brief shows: (1) DePew had spoken to an undercover police officer shortly before another illegal gambling establishment where she worked was raided and shortly before the murder of Gary Williams, an employe of an illegal gambling house in Polk County; (2) DePew had expressed fears that she might be murdered; and (3) there were rumors circulating following her murder that there was a "contract" out for her death and that her death was related to that of Williams.

In determining relevance, we consider whether the evidence is probative of a fact that the defendant is entitled to prove and then balance the probative value against its prejudicial tendency. OEC 410, 403; *see State v. Gardner,* 67 Or App 404, 410, 679 P2d 306 (1984); *State v. Sjogren,* 39 Or App 639, 593 P2d 1188 (1979). Determination whether probative value outweighs prejudice is a matter of trial court discretion. *See*

*State v. Cole,* 66 Or App 203, 673 P2d 587 (1983), *rev den* 296 Or 486 (1984); *see also State v. Hall,* 36 Or App 133, 136, 583 P2d 587 (1978).

■     The trial court did not abuse its discretion in excluding the evidence. Rumors, circumstances and DePew's fears are not probative of much at all. Defendant's testimony only marginally tended to show that another person may have had a motive to commit the crimes. As the trial court noted, defendant's evidence did not even point to a particular individual. Any probative value was far outweighed by the potential of that testimony to mislead the jury. *See State v. Woodfield,* 62 Or App 69, 71-72, 659 P2d 1006, *rev den* 295 Or 259 (1983).

■     Defendant contends that his right to due process was denied by the exclusion of the evidence. Although denial to a defendant of the opportunity to present evidence on his behalf may violate due process, *see Chambers v. Mississippi,* 410 US 284, 93 S Ct 1038, 35 L Ed 2d 297 (1973), a defendant does not have a right to present irrelevant evidence.

> "Few rights are more fundamental than that of an accused to present witnesses in his own defense. * * * In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. * * *" *Chambers v. Mississippi, supra,* 410 US at 302. (Citations omitted.)

Defendant received a life sentence with a minimum of twenty years, pursuant to ORS 163.105(2), for the aggravated murder conviction and twenty years with a minimum of ten years, apparently pursuant to ORS 144.110, on the attempted aggravated murder conviction. The sentences are to run consecutively. Defendant contends that the twenty-year minimum for aggravated murder violates Article I, sections 15 and 16, of the Oregon Constitution. We have held that such a minimum does not violate Article I, section 15, the "Reformation Clause." *Norris v. Cupp,* 67 Or App 393, 678 P2d 756 (1984).

■     Citing *State v. Shumway,* 291 Or 153, 630 P2d 796 (1981), defendant also contends that the 20-year minimum sentence is disproportionate to the crime under Article I,

section 16. He has not demonstrated that his sentence presents a disproportionality issue like that in *Shumway,* where the court held that the relative sentences for two crimes were disproportionate because the lesser offense carried a greater sentence. Neither do we think that the sentence for aggravated murder violates Article I, section 16, in any other manner. *Tuel v. Gladden,* 234 Or 1, 379 P2d 553 (1963) (Habitual criminal act authorizing life imprisonment without parole did not violate Article I, section 16). The sentence imposed is not "so disproportionate to the offense as to shock the conscience of fairminded" persons. *See State v. Humphrey,* 253 Or 183, 452 P2d 755 (1969). Defendant argues that the ten-year minimum for attempted aggravated murder is unconstitutional under *State v. Macy,* 295 Or 738, 671 P2d 92 (1983). That issue was decided unfavorably to defendant's position in *State v. Turner,* 296 Or 451, 676 P2d 873 (1984). There are thus no defects in defendant's sentences.[2]

Affirmed.

---

[2] Defendant also contends that his demurrer to the indictment on the ground that ORS 163.095(2)(e) is vague and overbroad should have been sustained. The assignment is without merit.