STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LARRY YANEZ RUBIO,
*Defendant-Appellant.*
084386BFE; A142063 (Control)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

LOUIS WAYNE GALLIGAN,
*Defendant-Appellant.*

Jackson County Circuit Court
084386AFE; A142064

273 P3d 238

Kenneth A. Kreuscher argued the cause for appellants. With him on the brief was Portland Law Collective, LLP.

Janet A. Klapstein, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General and Mary H. Williams, Solicitor General.

Before Ortega, Presiding Judge, and Brewer, Chief Judge, and Sercombe, Judge.*

BREWER, C. J.

---

* Brewer, C. J., *vice* Rosenblum, S. J.

**BREWER, C. J.**

Defendants in these consolidated cases each were convicted of one count of first-degree robbery, ORS 164.415, one count of third-degree assault, ORS 163.165, and one count of first-degree burglary, ORS 164.225. On appeal, defendants raise numerous challenges to their convictions and sentences, most of which are identical as to each defendant. We write to address two of the assignments of error that are common to both defendants, and we reject without discussion their remaining assignments of error. The first argument concerns the trial court's provision in each of the judgments that the defendants "[n]ot have contact with the victim." The second argument concerns the trial court's evidentiary ruling that precluded defense counsel from inquiring on cross-examination of a state's witness concerning the identity of a person who had possessed a firearm after it was used in the commission of the crimes at issue. As explained below, we conclude that the trial court did not abuse its discretion in limiting cross-examination of the state's witness on the ground that the matter was collateral and would be confusing to the jury. The trial court did, however, commit plain error by including in each of the judgments the provision that defendants not have contact with the victim. Accordingly, we affirm defendants' convictions, but remand for entry of corrected judgments deleting the erroneous terms pertaining to contact with the victim.

Because defendants were convicted after a jury trial, we recite the facts in the light most favorable to the state. *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007), *cert den*, 552 US 1113 (2008). The victim, Bateman, was dating Gallegos. On October 14, 2009, Bateman was spending the night in a motel, and Gallegos, along with a friend, Carter, and defendant Rubio, came to Bateman's motel room late in the evening. Gallegos and Carter knew that Bateman had sold a car the previous day and had $2,600 in cash with him. Bateman did not know Rubio, whom Carter introduced as like her brother. Carter brought hashish with her, and she sold $20 worth of hashish to Bateman. The group smoked marijuana and hashish. Gallegos became upset when Bateman refused to give her some of his money, and the three

visitors left Bateman's motel room. Rubio told Carter that he intended to return to the motel and rob Bateman.

Rubio went to the house of another friend, Norton, and told Norton that he knew someone who had $2,600 in cash and that he wanted to take it. Defendant Galligan, who was present at Norton's house, gave Rubio a .22 pistol, and both Rubio and Galligan left Norton's house. Defendants then went to Bateman's motel room. Rubio knocked on the door and indicated that he was looking for something that Carter had left behind earlier. Bateman opened the door, and both defendants pushed their way into the room. Rubio pointed the .22 pistol at Bateman, and Galligan was armed with a hammer. Defendants told Bateman that they wanted his money, and Galligan said, "We can do this the easy way or the hard way." Both defendants rushed Bateman, and Galligan hit Bateman with the hammer. A struggle ensued, and, when Bateman managed to pound on the wall with a telephone, both defendants fled. Galligan left behind a pair of glasses, his hat, and the hammer. Bateman immediately called the police, who arrived several minutes later.

Defendants returned to Norton's house, where Rubio indicated to Norton that he had tried to use the gun during the robbery but that it had not worked. Norton explained to Rubio that the safety was still on, and showed him how to take the safety off and how to take the clip out. Norton observed that the clip was fully loaded. Norton agreed to dispose of the gun for Rubio.

Meanwhile, Bateman had described the crime to the police; he told them that he believed that Gallegos and Carter had set him up. Bateman told officer Moffitt where Gallegos lived and provided a description of the van that Carter had been driving when they had been at the motel earlier. Moffitt located Carter's van in front of Gallegos' house and determined that the vehicle's engine was still warm. Moffitt could see lights on inside the house, and he could hear voices. He approached the door and heard a male voice saying, "If he wasn't such a bitch he would have given me the money."[1]

---

[1] Carter similarly testified that when Rubio came to Gallegos' house after the robbery, Rubio stated that he had tried to rob Bateman but had been unable to get the money.

When backup officers arrived, Moffitt knocked on the door and announced that he was a police officer. The lights were immediately turned out, and one of the backup officers saw a man look out of an open window. Eventually, Gallegos opened the door and indicated that only she and Carter were inside. A search of the residence revealed that Rubio was in one of the bedrooms. As Moffitt questioned Rubio, he recognized Rubio's voice as the male voice that he had heard a few minutes earlier.

Investigating officers later interviewed Norton, who acknowledged that he had agreed to dispose of the gun after the crime. Norton agreed to retrieve the gun for the officers, but he refused to tell them where he had taken it. After Norton retrieved the gun and turned it over to the officers, it was sent to the crime laboratory and determined to be operable.

As noted, both defendants were charged with, among other crimes, robbery in the first degree that was alleged to have been committed while defendants were "armed with a deadly weapon." ORS 164.415(1)(a).[2] A deadly weapon is one designed for "and presently capable of causing death or serious physical injury." ORS 161.015(2). It follows that whether the gun was, in fact, operable when it was used in the robbery was pertinent to the state's case. Defendant Gallegos's theory of the case was that no robbery had occurred, that the evidence merely pointed to a drug deal that had gone bad, and that the state's witnesses lacked credibility. Defendant Rubio made essentially the same argument, with the additional argument that the witnesses were lying about Rubio being involved at all, and that he was not the person whom Gallegos and Carter had brought to the victim's motel room.

---

[2] Both defendants also were charged with second-degree robbery under alternative theories: That defendants were "armed with what purport[ed] to be a * * * deadly weapon," the gun, or "armed with what purport[ed] to be a dangerous * * * weapon," the hammer. ORS 164.405(1)(a).

Defendants were *not* charged with first-degree robbery for having "use[d] or attempt[ed] to use a dangerous weapon," or having "cause[d] or attempt[ing] to cause serious physical injury to any person." ORS 164.415(1)(b), (c). Nor were they charged with second-degree robbery on the theory that each was "aided by another person actually present." ORS 164.405(1)(b).

The state adduced evidence that, when Rubio returned from the robbery, he complained that the gun had not worked during the robbery. Norton then inspected it and determined that, although the clip was fully loaded, the safety was on, which would have prevented the gun from firing. Norton further testified that, after the robbery, he had secreted the gun in an unspecified location. Although he willingly retrieved the gun when the officers asked him to do so, he did not tell them where he had hidden it. At trial, during cross-examination, defense counsel questioned Norton about with whom and where the gun had been secreted. The following exchange occurred:

"Q: And then who did you give the gun to? * * * [A]fter the gun was put in the bag, where did the gun go?

"A: It left and went to a secure place.

"Q: And where is that secure place?

"A: Not here in town.

"Q: And how did the gun get back into town?

"A: Me.

"* * * * * *

"Q: Prior to—that is prior to you bringing the gun to Detective Ivens, where did the gun go?

"A: I'd rather not say."

Counsel asked the court to instruct Norton to answer, but the court replied that the inquiry was collateral. Counsel argued that it was not collateral, because there were issues "as to whether or not it was loaded, whether or not it was operable." The court concluded that whether the gun was loaded or operable at the time Norton secreted it would be relevant, but that the identity of the person with whom he had secreted the gun was collateral. The court stated that the evidence would "go more toward confusing the jury and it's not relevant to whether the safety was on or whether it was off during the course of the robbery or whether there [were] bullets in the gun or not during the course of the robbery." The court further stated that "the identity of the actual person" with whom the gun had been secreted would not help

the jury determine any of those questions, but that counsel could inquire of Norton what condition the gun was in when he turned it over to the unnamed person. However, defense counsel declined to further pursue such a line of inquiry. Moreover, neither defendant emphasized in arguments to the jury any issue concerning the operability of the gun. The jury ultimately convicted defendants on the counts described above, and this appeal ensued.

Both defendants argue on appeal that the court should have required Norton to identify the person with whom he secreted the gun after the crime. As we understand it, defendants' theory is that, if Norton had been required to disclose that information, defense counsel could then have sought out that person or those people and questioned them at trial about whether they had examined the gun while it was in their possession, determined it to be inoperable and taken steps to make the gun operable before Norton retrieved it and gave it to the police. That is, defendants assert on appeal that the proffered evidence might have led to additional evidence from other witnesses that could have been pertinent to the operability of the gun after the crime.

We understand the trial court to have concluded that the evidence at issue would have met the very low threshold for relevance established by OEC 401. Thus, the question before us is whether the court properly excluded the evidence under OEC 403, which provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

We review a trial court's ruling under OEC 403 for an abuse of discretion. *State v. Williams*, 313 Or 19, 29-30, 828 P2d 1006, *cert den*, 506 US 858 (1992). We understand the trial court's description of the proffered evidence as "collateral" to mean that the court viewed the evidence as having low probative value. We agree. As noted, the record shows that the purpose of the proffer was to suggest that, while the gun was out of Norton's possession, something might have happened to it to make it operable. However, because the gun

was not in Norton's possession, he would have had no *direct* knowledge of what may have been done to it during that period. Thus, establishing who had the gun at a certain point after the crime was committed would have had little if "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401.

The admitted evidence established that, at some point after the crime was committed and before it was recovered by the police, the gun was secreted in an unknown location. Based on that evidence, defendants could have argued—but in fact did not argue to the jury—that something could have happened to the gun during that time to render it operable and, perforce, the state had not proved beyond a reasonable doubt that it was a "deadly weapon" at the time the crime was committed. However, in the absence of an additional foundation, evidence of *who* had the gun during that time would have added nothing of material significance in this case, particularly since neither of defendants' theories of the case focused on the operability of the gun.[3]

The potential for confusion of the jury, however, was considerable. Norton had a criminal record that included felony convictions, and it was clear from what he told the police, as well as from his testimony at trial, that he was aware of the significance of felons being in possession of firearms. *See* ORS 166.270 (felon in possession of a firearm is a Class C felony). It can be inferred from those circumstances that Norton did not wish to reveal the identity of the person with whom he had secreted the gun because he understood that that person, too, might face criminal liability. Thus, the court could properly view inquiries relating to the criminal history of various people who may have possessed the gun at some point after the crime was committed as collateral and distracting the jury from the question whether the gun was, in fact, a "deadly weapon" when it was used in the robbery. *See, e.g.,*

---

[3] Because the only evidence concerning the gun's operability tended to show that defendant Rubio had attempted to shoot the victim with the gun during the robbery, it is not surprising that defendant Rubio did not choose to focus on that issue.

*State v. Cox*, 337 Or 477, 486, 98 P3d 1103 (2004), *cert den*, 546 US 830 (2005) (trial court did not abuse its discretion in excluding under OEC 403 evidence of a victim's violent acts that was relevant to prove that the defendant feared the victim, but that provided only a "weak inference" that the defendant even knew of the victim's violent acts); *State v. Holterman*, 69 Or App 509, 515-16, 687 P2d 1097, *rev den*, 298 Or 172 (1984) (court properly excluded as confusing to the jury speculative circumstantial evidence that the defendant wanted to present in order to support his theory that another person or persons had motive to commit the charged offenses).

In these circumstances, the trial court did not abuse its discretion in excluding the proffered evidence under OEC 403 on the ground that its probative value was substantially outweighed by the risk of unfair prejudice and confusion of the issues before the jury.

Defendants next assert that the trial court committed plain error by including in each judgment a provision that defendants have no contact with the victim. The state responds that any error is not apparent on the face of the record. However, after the parties' briefed this case, this court held, in *State v. Langmayer*, 239 Or App 600, 244 P3d 894 (2010), that including such a provision in a criminal judgment constitutes reversible error. The state nonetheless asserts that this court should not exercise its discretion to correct the error because the Board of Parole and Post-Prison Supervision could impose a similar condition upon defendants' release onto post-prison supervision. ORS 144.102(3). Although ORS 144.102(3)(b)(G) requires the board to impose "no contact with the victim" conditions for offenders convicted of sexual offenses, that provision does not apply here. ORS 144.102(3)(a) permits the board to impose other special conditions, which could include a condition of no contact with the victim, but only if the board deems it "necessary because of the individual circumstances of the person on post-prison supervision." In this case, it would be speculative to conclude that the board would deem such a condition necessary. Accordingly, we agree with defendants that the trial court plainly erred and that we should exercise our discretion to correct the error.

Defendants also assert that this court should "remand the case for a full resentencing," citing ORS 138.222(5). Under ORS 138.222(5), if we determine that a sentencing court "committed an error that requires resentencing," we are required to "remand the entire case for resentencing." If there "remain options that the trial court permissibly could adopt on resentencing," an appellate court has "no other option under ORS 138.222(5) than to reverse the sentence of the trial court and remand the entire case to that court for resentencing." *State v. Edson*, 329 Or 127, 139, 985 P2d 1253 (1999). *Cf. State v. Rodvelt*, 187 Or App 128, 66 P3d 577, *rev den*, 336 Or 17 (2003) (when there is error in one conviction or sentence under the sentencing guidelines, those errors may affect how the remaining sentences were determined, and thus the entire case must be remanded for resentencing). In this situation, however, the sentencing court lacked authority to impose conditions of incarceration or post-prison supervision. Thus, there do not "remain options that the trial court permissibly could adopt on resentencing," *Edson*, 329 Or at 139, that relate to this error. Because the only error was the inclusion of terms in the judgments that the trial court had no authority to impose, the appropriate remedy is to remand with instructions to delete the erroneous terms from the judgments.

Remanded for entry of corrected judgments deleting erroneous terms relating to contact with the victim; otherwise affirmed.