Argued November 2, decided November 24, 1908.

## STATE v. HORSEMAN.

[98 Pac. 135.]

CRIMINAL LAW—EVIDENCE—ACTS OF CONSPIRATORS.

1. When the fact of a conspiracy has been established, the acts and declarations of one conspirator in furtherance of, or made with reference to, the common design, are admissible in evidence against his associates.

HOMICIDE — EVIDENCE — SELF-DEFENSE — THREATS — ADMISSIBILITY — REASON FOR.

2. Evidence of threats is relevant, because it tends to illustrate the feeling of the person killed, injured, or alleged to have been making an attack on accused, and proof of the communication of the menace is admissible in a prosecution for the homicide or for the assault, for that it serves to show that the defendant, being aware of such feeling, was justified in action with reference to it.

HOMICIDE—EVIDENCE—SELF-DEFENSE—THREATS BY A THIRD PERSON.

3. In a prosecution for homicide, in which it was shown that the killing occurred after an altercation in which defendant was severely beaten by deceased in the presence of a third person, and while deceased and the third person were advancing upon the defendant in a threatening manner, evidence of threats by the third person at a previous time, which had been com-

municated to the defendant before the killing, is admissible on the issue of self-defense, though no conspiracy was proven between the deceased and the third person.

From Umatilla: HENRY J. BEAN, Judge.

The defendant, George L. Horseman, was convicted of the crime of manslaughter, committed in Umatilla County, on the 11th day of May, 1907, by shooting at and killing Clarence McBroom, and from the judgment and sentence that followed, he appeals.       REVERSED.

For appellant there was a brief with oral arguments by *Mr. James H. Raley* and *Mr. James A. Fee.*

For the State there was a brief over the names of *Mr. Gilbert W. Phelps,* District Attorney, *Mr. Andrew M. Crawford,* Attorney-General, and *Mr. John McCourt,* with oral arguments by *Mr. Phelps and Mr. Crawford.*

MR. JUSTICE MOORE delivered the opinion of the court.

The defendant, George L. Horseman, was convicted of the crime of manslaughter, alleged to have been committed in Umatilla County, May 11, 1907, by shooting at and killing Clarence McBroom, and he appeals from the judgment which followed. His counsel assert that the killing was done in self-defense, and contend that errors were committed in refusing to receive evidence of threats made against Horseman's life by William Curtwright, who, at the time of the homicide, was also advancing, it is maintained, in a threatening manner towards and near the defendant; and in refusing to charge, as requested, in relation to such threats and to the concert of action.

As tending to show a mutuality of purpose on the part of McBroom and Curtwright to molest the defendant, it is deemed essential to state with some degree of particularity the latter's theory of the case as developed by him and his witnesses at the trial. The testimony shows that in December, 1906, pursuant to a written request from the County Judge of Umatilla County, the defendant notified McBroom to remove some of his wire

fencing which had fallen in the public highway. Because Horseman was not the road supervisor, this request made McBroom very angry, and he applied to the defendant vile and opprobrious epithets, ordered him to get off the horse he was riding, and threatened to beat him. Horseman rode away, and McBroom, mounting a horse, followed him about 75 yards, when he met Curtwright, to whom he, referring to the defendant, said: "If you will go with me, I will catch him, pull him off his horse, and beat him to death." The next day, while the defendant was watering stock near a fence, he heard a horse coming, and, looking up, saw McBroom, who, with an oath and vile words, said, "I have got you now," and, dismounting, he approached the fence, but was prevented from climbing over it by demonstrations made by Horseman with a pocketknife. McBroom then got upon his horse and rode away, saying he would kill the defendant, and soon thereafter Curtwright passed the place carrying a rifle. From that time until the homicide, whenever Horseman saw McBroom passing along the highway, he avoided him.

The defendant and nearly all of the witnesses who appeared at the trial herein are stock raisers, and at a meeting of men engaged in that business, held at Heppner in February, 1907, to secure from an agent of the general government permission to pasture stock on a forest reserve, Curtwright, in the presence of others, made threats against Horseman, the language of which was not permitted to be given in evidence, on the ground that no conspiracy had been established between him and McBroom; but, for the purpose of showing Curtwright's hostility as a witness, the court allowed testimony to be introduced to the effect that he had made threats as asserted. The defendant's counsel thereupon stated that, if the witnesses were permitted to answer the questions propounded to them, they would testify that at the Heppner meeting, in which Horseman took an active part, Curtwright said in their presence: "If

my cattle do not go on that range, it is Horseman that is to blame for it, and he will never see the Potts again" —meaning thereby the neighborhood near which the defendant lived. This offer was rejected, and an exception saved. The threat so imputed to Curtwright was communicated to the defendant prior to the homicide. Horseman circulated a petition in the vicinity of the Potts, calling a meeting to be held at the Gurdane schoolhouse, May 11, 1907, for the purpose of employing men to ride after and care for their stock that season, and of dividing the range between the stock and the sheepmen. McBroom, on March 28, 1907, in conversing with George Taylor, had said of Horseman, "I will kill the son of a b—— before the summer is over with," and about the same time had told Frank Hinkle that he was going to whip the defendant. On May 10th of that year, he informed Anthony Corley that he expected to attend the stock raisers' meeting, to be held the following day, and then, referring to Horseman, said: "I am going to give him a licking and a G—d d——d good one." It does not appear that either of these threats was communicated to the defendant before the shooting.

McBroom lived on a homestead about a half of a mile northeast of the schoolhouse mentioned, and Curtwright, whose brother married a sister of McBroom, lived near the latter. McBroom and Curtwright on May 11, 1907, passed the schoolhouse at an early hour, and went southwesterly, to the homes of Daniel Hicks and of James Hall, who were McBroom's brothers-in-law, and these four men went in company across the fields to the schoolhouse, to attend the meeting. The defendant reached the place of assembly prior to their arrival, however, and, the morning being cool, he assisted in building a fire in the stove. Thereafter he went outside of the building, the door of which is in the east end, and, as he was shaking hands with a neighbor, he was, without any notice or warning, struck a violent blow

under the ear by a person whom he found out to be McBroom, who, with Curtwright, Hicks, and Hall, came around the southeast corner of the house. Horseman is past middle life, and at the time of the encounter was ill, while McBroom was only 23 years old, weighed about 180 pounds, and was quote vigorous. McBroom severely bit the defendant's thumb, struck him in the face with his fists, threw him, and continued the castigation. Horseman, at the beginning of the attack, and repeatedly while it was in progress, urged the men who witnessed it to take McBroom away, and one of them attempted to comply with the request, but was prevented from doing so by Hall, who said of his brother-in-law, "Let him beat him up awhile." Finally, one of the men present said to Hall, in referring to McBroom, "If you don't take him off, I'll kick him off," and thereupon Hall told his brother-in-law to get up, which order he obeyed. The injury inflicted upon Horseman was two teeth knocked loose, his lip nearly cut in two, his nose slightly broken, his thumb and hand lacerated, and a contusion made on his back in the region of his kidneys, as a result of which, on several occasions immediately thereafter, he passed bloody urine. After the attack, McBroom went into the schoolhouse, and, while Horseman was washing the blood from the bruises on his face, Curtwright walked back and forth behind the defendant, abusing and cursing him—calling him all kinds of vile and opprobrious names—and, referring to the beating which he had received, said: "You * *, you haven't got half what you will get." He further observed that, if he caught the defendant driving his cattle again, he would never drive any other person's stock. McBroom remained in the building about 10 minutes, when discovering that in the encounter he had lost a pocketknife, he went outside to look for it. He and Curtwright, each cursing and abusing Horseman, advanced toward him, one on the right and the other on the left, when Curt-

wright, alluding to a weapon which he knew the defendant carried, said, "You G—d d——d son of a b——, I will shove that gun up you," and McBroom, alluding to the firearm, remarked, "I will make you eat it." As they advanced, Curtwright assumed a threatening attitude, and it appeared, as detailed by a witness, that he was going to attack the defendant, who then stepped back two or three paces and told them to stay away from him. McBroom, as another witness declared, acted as if he were going to make a run upon the defendant. At that time McBroom had his hand in his pocket, and, as he attempted to withdraw it, Horseman, fearing from the severe beating which he had received, and from the threats of his assailants which had been communicated to him, that his life was in danger, fired at and immediately killed McBroom.

The foregoing is believed to be a fair synopsis of the material testimony illustrating the defendant's theory of the case. The evidence offered by the State, however, tended to show that, after the first encounter, as McBroom was leaving the school grounds for his home, Horseman, smarting under the punishment which he had received, and instigated by the taunts as to his cowardliness in respect to the use of a deadly weapon, drew his gun and pointed it at McBroom's back, whereupon Hicks, observing the movement, shouted to the defendant: "Don't do that, George! Don't do that!" · Upon hearing which McBroom turned toward Horseman just in time to receive the shot in the face.

The defendant's counsel requested the court to give the following instructions:

"In determining whether the defendant acted as a reasonable man, and whether he had reasonable ground to apprehend death or great bodily harm at the hands of the deceased at the time he fired, I instruct you: You have a right to take into consideration the threats made by (Curtwright and) the deceased, if any, against the defendant [and communicated to the defendant],

52 Or.—— 19

the assault made upon him by the deceased, the language, attitude, and bearing of (Curtwright and) McBroom at the time the shot was fired, and all the other facts and circumstances known to, (or) [and] believed by, the defendant at that time, touching the danger in which he believed himself at that time to be placed. Mere threats will not justify a killing in self-defense, and if the jury find from the evidence that (both Curtwright and) McBroom had made threats against the life of the defendant prior to the shooting of the deceased, and you further find that these threats had been communicated to the defendant, and if you further find that (at the time of the killing McBroom and Curtwright were acting together, and that) McBroom, a short time prior to the killing, had made a violent assault upon the defendant, and that (they were) [he was] using violent, abusive, and threatening language towards the defendant, but the evidence leaves the jury in doubt as to what the acts of the deceased were at the instant the shot was fired, or as to what the defendant might properly apprehend in respect to the intentions of the deceased, the jury are entitled to consider the threats in connection with other evidence in determining what apprehension might reasonably arise in the mind of the defendant from the conduct of the deceased (and what the motive of the deceased and of Curtwright was in making the attack, if any)."

The court declined to give the requested charges, but, striking out the words included within the parentheses, and inserting those contained in the brackets, as above indicated, instructed the jury in the language as revised, and an exception was reserved. The court, by eliminating from the requested instructions all reference to the threats imputed to Curtwright and to the conduct attributed to him that might be directed against or injurious to Horseman, pursued the order of practice adopted when evidence of the threats, alleged to have been made at Heppner, were first sought to be introduced, basing its action on the doctrine that the testimony offered did not establish a conspiracy between Curtwright and McBroom to molest the defendant. As the

exceptions thus taken practically present but one question, the action of the court complained of will be treated as a single alleged error.

1. The legal principal which the court evidently invoked in the case at bar finds expression in the following language: "When the fact of a conspiracy has been proved or established by reasonable inference, the acts and declarations of one conspirator in furtherance of, or made with reference to, the common design, are admissible in evidence against his associates." 6 Am. & Eng. Enc. Law (2 ed.) 866. If the purpose of producing testimony relating to the threats alleged to have been made by Curtwright at Heppner against the life of Horseman, was to impute such menace to McBroom, so as to justify shooting him, upon his making a hostile demonstration towards the defendant, in the absence of Curtwright, the action of the court in excluding the evidence offered, and in refusing to charge the jury as requested, might be upheld. We do not understand that evidence of the threats alleged to have been made at Heppner was put forward for that purpose, but solely to explain Curtwright's animus in making advances in a threatening attitude towards Horseman, and to ascertain, if possible, the reasonable apprehension which the defendant entertained when he, with knowledge of such threats, saw Curtwright approaching.

2. Evidence of threats is relevant, because it tends to illustrate the feeling towards the defendant of the person killed, injured, or alleged to have been making an attack upon the accused, and proof of the communication of the menace is admissible in a prosecution for the homicide or for the assault, for that it serves to show that the defendant, being aware of such feeling, was justified in acting with reference to it. *State* v. *Nelson,* 68 Kan. 566 (75 Pac. 505), 1 Am. & Eng. Ann. Cas. 468.

3. It is possible Curtwright knew, when he went to the schoolhouse on the day of the homicide, that Horseman was to be punished severely, because, assuming to act as road supervisor, he requested McBroom to remove his wire fencing from the public highway. The latter was not alone when he was shot; nor was he, so far as disclosed by the testimony herein, acting for, or as the agent of, Curtwright, so as to require any proof whatever of a conspiracy existing between them before evidence of the threats alleged .to have been made by Curtwright was admissible. Curtwright was not the agent of McBroom, but a principal acting for himself when advancing in a threatening manner upon the defendant at the time the fatal shot was fired, and, if Curtwright had been the victim, his communicated threats, made against the defendant, would unquestionably have been admissible in evidence so as to discover, if possible, the latter's reasonable apprehensions when he saw his adversary approaching. It may be that Curtwright was a conspirator and had agreed to aid McBroom in administering to Horseman a violent chastisement; but, if such unlawful combination had been consummated, it would have been unnecessary to establish the fact, except by inference, which the jury had the right to deduce from Curtwright's conduct at the time of the homicide, for, if he were present as an aider and abettor in making the final attack, he would be a principal, although McBroom, by placing his hand in his pocket and attempting suddenly to withdraw it, made the more hostile demonstration. *State* v. *Nargashian,* 26 R. I. 294 (58 Atl. 953: 106 Am. St. Rep. 715: 3 Am. & Eng. Ann. Cas. 1026). Thus in *Cartwright* v. *State,* 16 Tex. App. 473, 487 (49 Am. Rep. 826), Mr. Justice WILLSON, in commenting upon an instruction given in a similar case, says: "Again, the right of self-defense, by the charge, is restricted to defense against the violence of deceased alone. Under the facts of this case it was an

error to thus restrict it. There were two other persons present, apparently acting with deceased, one of whom was armed with a gun. If these persons were acting with the deceased in an attack upon the defendant, or if they or either of them made an attack upon defendant, deceased being present and acting with them in such manner as to make him a principal in such attack, or if the appearances were such as to cause in the mind of the defendant a reasonable belief, and did cause such belief, that the deceased was a party to the attack upon him, or which was about then to be made upon him, by all or either of said persons, then defendant's right of self-defense would extend to the acts of each and all of the party, because the violence of one of them would be that of all." In *Jones v. State,* 20 Tex. App. 665, 671, the plaintiff in error was convicted of an aggravated assault and battery committed upon E. Stringer, and appealed. At his trial, testimony was introduced tending to show that in an encounter, Stringer struck Jones, knocking him down, and as he fell a pistol was fired from the direction in which Stringer and others were standing. Stringer thereupon advanced upon Jones, who fired upon and wounded him. An instruction limited the right of self-defense to the attack made by Stringer alone, and did not include immunity from the actions of other persons who were with him at the time of the assault. In reversing the judgment, Mr. Justice HURT comments upon this part of the charge as follows: "Now, if those persons were acting with Stringer in an attack upon defendant, or if they or either of them made an attack upon defendant, Stringer being present and acting with them in such manner as to make him a principal to such attack and if the appearances were such as to cause in the mind of defendant a reasonable belief, and did cause such belief, that Stringer was a party to the attack made upon him, or which was about to be made upon him, by all or either of such parties, the defendant's right

of self-defense would extend to the acts of each and all of the party, because the act of one would be that of all." So, too, in *State* v. *Adler,* 146 Mo. 18 (47 S. W. 794), in a prosecution for murder, in which the plea of self-defense was relied upon, it was ruled that, where there is evidence tending to show that, at the time defendant shot deceased, he was being pursued by him and a large number of angry and excited people, at least one of whom had an open knife in his hand, another a pistol, and others parts of bricks, an instruction that restricted the right of defendant to defend himself against the assault of the deceased alone was too narrow.

The court erred in refusing to give the instructions as requested, and in rejecting evidence of Curtwright's threats, which necessitates a reversal of the judgment. A new trial is therefore ordered.        REVERSED.