Argued and submitted July 20, judgment of conviction and sentence of death affirmed October 14, 2004, reconsideration denied January 25, 2005

STATE OF OREGON,
*Respondent,*

*v.*

DAVID LEE COX,
*Appellant.*

(CC 99C46448; SC S48092)

98 P3d 1103

Terry Ann Leggert, Judge.

Dan Maloney, Deputy Public Defender, Salem, argued the cause and filed the briefs for appellant. With him on the briefs was Peter A. Ozanne, Executive Director, Office of Public Defense Services.

Erika L. Hadlock, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent. With her on the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, Timothy Sylwester and Ryan Kahn, Assistant Attorneys General.

KISTLER, J.

**KISTLER, J.**

This case is before us on automatic and direct review of defendant's judgment of conviction and sentence of death. Defendant raises 37 assignments of error challenging the trial court's rulings during the guilt and penalty phases of his trial. For the reasons set out below, we affirm the judgment of conviction and sentence of death.

This case arises out of a homicide at the Oregon State Penitentiary (OSP). The relevant facts divide into three parts: defendant's relationship with the victim, Mark Davis; Davis's relationship with the Lakota Club and another inmate, Donnie Graham; and finally the agreement among the Lakota Club, Graham, and defendant to kill Davis. We begin with the relationship between defendant and Davis and set out the facts consistently with the jury's verdict. *See State v. Pratt*, 309 Or 205, 207, 785 P2d 350 (1990), *cert den*, 510 US 969 (1993) (stating standard of review).

In 1998, a dispute arose between defendant and Davis. Davis asked defendant for permission to use defendant's "rig," a homemade syringe used to inject drugs. Although defendant denied Davis permission, Davis told defendant's cellmate otherwise. The cellmate gave Davis defendant's rig, which contained defendant's drugs. Defendant became upset when he learned what had happened. In an effort to make things right, defendant's cellmate took Davis's sunglasses and gave them to defendant. Later, in front of other inmates, Davis took his sunglasses back from defendant at knife point.

Within the prison, defendant had a reputation as a "heavyweight" convict—someone who demanded respect from the other inmates. Davis enjoyed a lesser reputation. According to one inmate, Davis was a "punk"—someone who was "just a complete scumbag, homosexual, not to be trusted." When Davis took his sunglasses back from defendant at knife point, he undermined defendant's reputation within the prison. As an inmate explained, "if [Davis] does something bad to [defendant] and [defendant] doesn't respond to it, he's now gotten punked by a punk. We call that

being a punk's punk." To restore his reputation, defendant needed to retaliate against Davis.

Davis also had problems with other inmates. Davis was involved in trafficking heroin and tobacco within the prison. Davis traded heroin that he obtained from an inmate, Graham, to the Lakota Club[1] for tobacco. Davis in turn traded the tobacco that he received from the Lakota Club to Graham for heroin. The Lakota Club understood that Davis was getting the heroin from a guard, and Graham understood that Davis was getting the tobacco from a guard. Neither was aware that the other was supplying Davis with contraband.

Davis told the Lakota Club that the guard was late in supplying him with heroin and asked the club to "front" or advance him some tobacco until he could get the heroin and pay the club. Davis told a similar story to Graham. The club and Graham advanced respectively tobacco and heroin to Davis on the understanding that he would pay when the guard came through. There was, however, no guard, and Davis did not repay either the club or Graham.

Graham learned that Davis was getting the tobacco from the Lakota Club. Graham spoke with the club members and told them that he, and not a guard, had been supplying Davis with the heroin that Davis had been trading to the Lakota Club. When Graham and the Lakota Club realized that Davis had "burned" them, they were concerned about his actions for two reasons. First, he still owed them a debt. Second, and more importantly to Graham and the Lakota Club, Davis's actions affected their ability to collect from other inmates. A member of the Lakota Club explained:

> "[I]f word gets out that, you know, you're selling—you've got a product for sale, but yet you're going to let this guy over here who is considered a nobody to burn you, I mean, you

---

[1] On one level, the Lakota Club provides a place for Native Americans incarcerated in OSP to socialize and also to engage in religious ceremonies. However, one member of the club testified that, in addition to those officially sanctioned activities, the club was involved in "[d]rug smuggling, tobacco[s] * * * [m]aking weapons, dealing drugs, doing drugs; anything that was illegal to do in the prison, we did it." The witness later clarified that not all the club members were engaged either in illegal activities or in the agreement to kill Davis.

can't expect nobody else to pay their bill because they are going to look at you as being weak."

Graham and the Lakota Club were aware that Davis also had "burned" defendant in a deal and had "disrespected" defendant when he had taken the sunglasses from defendant at knife point. Recognizing that defendant had an interest in retaliating against Davis, Graham proposed that he, the Lakota Club,[2] and defendant enter into an agreement. Graham offered to give defendant $5,000 worth of heroin, and the Lakota Club offered to give defendant $500 worth of tobacco and supply him with a knife if defendant would agree to "deal with" Davis. Defendant accepted the offer.

Pursuant to their agreement, the Lakota Club and Graham provided defendant with the heroin and tobacco two to three weeks before he stabbed Davis. That way, defendant could "have some fun, get high, smoke cigarettes, sell some heroin and raise some money" before the stabbing. The Lakota Club also provided defendant with a knife. One of the club members gave defendant a shank (a homemade knife) that the club members had sharpened by grinding it on the concrete floor in the clubhouse. The "war chief" of the club explained to the club member who gave defendant the shank how to stab Davis in the back in a way that would kill him.

On September 13, 1998, as the inmates were lined up on the prison yard to return to their cells, defendant came quickly across the yard. Holding the shank with both hands, he stabbed the shank in Davis's back and pushed it up towards Davis's heart. He pushed so hard that one inmate saw Davis "going up on his toes as he was stabbed." Davis stumbled against another inmate and then reached back and pulled the shank out of his back. The shank went between Davis's ribs and into his left lung and aorta, causing him to die from internal bleeding.

A grand jury indicted defendant for aggravated murder and possessing a weapon in a correctional institution. *See*

---

[2] As noted, not every member of the club was a party to the agreement. Because the identity of the club members who were parties is not relevant to the issues that defendant raises, we refer to the club generally for ease of reference.

ORS 163.095(2)(b) (defining aggravated murder as intentional homicide committed by person confined in correctional institution); ORS 166.275 (prohibiting inmates from possessing weapons). The jury convicted defendant of both charges and imposed the death penalty. On review, defendant raises 37 assignments of error challenging his aggravated murder conviction and death sentence. We write to address 23 of the assignments of error. We affirm the other rulings to which defendant has assigned error without further discussion.

## EVIDENCE OF THE VICTIM'S CRIMINAL ACTS

■   At trial, defendant did not dispute that he had stabbed Davis. He argued, however, that he had intended to injure Davis, not kill him. It followed, he concluded, that at most he could be guilty of manslaughter. Defendant's counsel outlined defendant's theory of the case in his opening statement. Defendant claimed that he feared Davis and wanted to stab him so that the prison officials would transfer Davis to another facility. More specifically, defendant understood that, if he stabbed Davis and injured him, Davis would not tell the prison officials who had stabbed him. Not knowing who stabbed Davis, the prison officials would have to transfer Davis to a different facility to protect him.

To establish that he feared Davis, defendant sought to introduce evidence in the guilt phase of his trial that Davis had acted violently (1) towards defendant and (2) towards others in prison. The trial court ruled that defendant could introduce evidence of Davis's violent acts towards him but that he could not introduce evidence of Davis's violent acts towards others.

After the trial court made its ruling, defendant made an offer of proof to preserve his objection. He called witnesses who would have testified that: (1) on April 2, 1989, Davis became angry with his cellmate at the Oregon State Correctional Institution (OSCI) and cut him with a razor; (2) on October 27, 1989, Davis used a razor blade to hold a guard hostage at OSCI for approximately an hour; (3) in 1995, Davis stole an inmate's watch at OSP while the inmate was taking a shower and also pulled a weapon on another inmate to take his drugs; (4) in 1994 or 1995, Davis stole an inmate's

shoes at OSP and hit the inmate with his fists when he tried to retake the shoes; and (5) in 1996 or 1997, Davis robbed an inmate at OSP with a shank. Also, two of the inmate witnesses would have offered their opinion that Davis was violent, and one inmate witness would have opined that Davis was psychotic.[3]

After considering defendant's offer of proof, the trial court clarified the basis of its ruling. It stated that evidence of Davis's violent acts towards others had little bearing on whether defendant intended to injure rather than kill Davis. Even if the evidence had some relevance, the court concluded that the prejudicial effect of the evidence outweighed its probative value. The court reasoned that evidence of Davis's violence towards others

"would be misleading to the jury and create a lot of additional evidence that would just become confusing, and I think really would just be a—lead the jurors * * * more down the line [that] the victim deserved to be killed, so we're not going to pay attention to whether or not the defendant was trying to kill the victim or just injure him, which is really what th[e jurors] need to be focused on in this case."

The court also noted that, without testimony that defendant was aware of Davis's violent acts towards others, evidence of those acts would not be relevant. The court accordingly permitted defendant to introduce evidence only of Davis's violent acts towards defendant.

■ Under OEC 404(3), a three-part test applies when a party seeks to introduce other crimes or bad acts evidence to prove motive:

" '(1) The evidence must be independently relevant for a noncharacter purpose [such as, in this case, proof of motive]; (2) the proponent of the evidence must offer sufficient proof that the uncharged misconduct was committed and that [the victim] committed it; and (3) the probative value of the uncharged misconduct evidence must not be

---

[3] Defendant testified as part of the offer of proof. The trial court, however, had struck defendant's testimony during the guilt phase because he had refused to answer cross-examination questions, and it did not consider defendant's testimony in determining whether the proffered evidence was admissible in the guilt phase.

substantially outweighed by the dangers or considerations set forth in OEC 403. Each of these requirements must be satisfied before uncharged misconduct evidence is admissible under OEC 404(3).'"

*State v. Hampton,* 317 Or 251, 254, 855 P2d 621 (1993) (quoting *State v. Johnson,* 313 Or 189, 195, 832 P2d 443 (1992)) (first brackets in original). The state does not dispute that defendant satisfied the second step in the test. It focuses instead on the first and third steps.

The first step in the test combines two analytically separate questions—whether the evidence is relevant and, if so, whether it is relevant for a purpose that OEC 404(3) permits. In this case, the state contends that defendant's evidence was not relevant, but it does not dispute that, if the evidence was relevant, OEC 404(3) permits its admission to prove defendant's motive. We pause briefly to explain why we agree that defendant's proffered evidence, if relevant, is admissible under OEC 404(3). Under that rule, other crimes evidence "is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." OEC 404(3). "It may, however, be admissible for other purposes, such as proof of motive." *Id.*; *see State v. Johns,* 301 Or 535, 544, 725 P2d 312 (1986) (explaining that OEC 404(3) is rule of inclusion).

Here, defendant sought to introduce evidence of Davis's other crimes to show that Davis had a propensity for violence. But he did not seek to prove that character trait to show that Davis had acted in conformity therewith, which is what OEC 404(3) prohibits. *See Johns,* 301 Or at 548 (stating that OEC 404(3) prohibits admission of other crimes evidence only if it is offered to prove *both* "(1) the character of a person, and (2) that the person acted in conformity therewith"). Rather, defendant sought to introduce evidence that Davis had acted violently to prove his own motive for stabbing Davis—that defendant reasonably believed that he needed to protect himself from Davis. OEC 404(3) permits the admission of other crimes evidence for that purpose. *See* Laird C. Kirkpatrick, *Oregon Evidence* § 404.06, Art IV-59 (4th ed 2002) (explaining proposition).

■ Having concluded that OEC 404(3) permits the admission of defendant's evidence, we turn to the question whether the evidence is relevant. Evidence is relevant if it increases or decreases, even slightly, the probability of the existence of any material fact in issue. *Hampton*, 317 Or at 255. In this case, the state argues that the proffered evidence was not relevant for two reasons. It observes initially that evidence of Davis's violent acts against others is relevant to prove defendant's motive only if defendant knew of those acts. On this record, the state contends, a reasonable juror could not find that defendant knew what Davis had done to others.

We agree that Davis's violent acts towards others are relevant to prove that defendant feared Davis only if defendant was aware of those acts. *See State v. Horseman*, 52 Or 572, 579, 98 P 135 (1908) (recognizing principle). As the state notes, without defendant's testimony, the jury could infer defendant's knowledge only from circumstantial evidence. On that point, defendant argues that one witness testified that the "prison grapevine is very accurate and very fast." Defendant contends that, given that evidence, a reasonable juror could infer that defendant was aware of Davis's violent acts both at OSCI and at OSP.

Two of the incidents concerning Davis that defendant included in his offer of proof occurred at OSCI approximately nine years before defendant stabbed Davis. Both incidents were remote in time; they occurred at a different correctional institution, and it would be mere speculation to conclude, on this record, that defendant was aware of those incidents.[4] The other incidents occurred at OSP from 1994 to 1997. Although somewhat distant in time, they did occur in the same penitentiary where defendant was incarcerated. We assume, without deciding, that evidence of the prison grapevine was sufficient to permit a weak inference that defendant was aware of the incidents at OSP.[5]

---

[4] Defendant notes that, in the offer of proof, one witness referred to an unspecified incident involving Davis at OSCI and said "that's a well-talked-about incident over at O[S]CI." The fact that the incident (whatever it was) was "well-talked-about at O[S]CI" does not mean that it was "well-talked-about" at OSP, where defendant was incarcerated.

[5] Three of the witnesses also offered opinions that Davis was either violent or psychotic. The fact that the witnesses had formed opinions about Davis does not

The state advances an alternative reason why the evidence was not relevant. It argues that evidence that defendant feared Davis did not make it more likely that defendant intended to injure rather than kill Davis. In the context of this case, we reach a different conclusion. Evidence that defendant feared Davis made it more likely that defendant would take some action to protect himself from Davis. Given the more serious consequences that would result from murder, the jury reasonably could agree with defendant's theory and find that he sought to injure rather than kill Davis in order to get the prison officials to move him. In sum, evidence of Davis's other crimes at OSP was relevant to prove that defendant feared Davis.

**4, 5.** The remaining question is whether, even if relevant, the evidence's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." OEC 403; *Hampton*, 317 Or at 254 n 4.[6] We review the trial court's resolution of that issue for abuse of discretion. *See State v. Barone*, 328 Or 68, 87, 969 P2d 1013 (1998), *cert den*, 528 US 1135 (2000) (employing that standard of review). In reviewing the trial court's ruling, we note that the court did not preclude defendant from introducing any evidence to prove that he feared Davis. Rather, it permitted him to introduce evidence of Davis's violent acts toward defendant. There was also evidence that another inmate had told defendant, when Davis tried to take his glasses back from defendant at knife point, that "you already know the guy is fucking crazy, man. He gets on them drugs and he wants more, you know. He's crazy." Similarly, another inmate testified that he did not have "any dealings" with Davis. He had explained that the "guy was a serious dope fiend, maniac. To have any dealings with Mark Davis would be jeopardizing your well—safety * * *."

---

imply that defendant was aware of their opinions or the basis for them; none of defendant's witnesses testified, for example, to Davis's reputation in OSP, which would have provided a different basis for inferring defendant's knowledge.

[6] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

In deciding whether to admit additional other crimes evidence, the trial court reasonably could conclude that the probative value of defendant's proffered evidence was minimal. There was, at best, only a weak inference that defendant was even aware of Davis's other crimes at OSP. Some of those crimes involved thefts with no threat of violence. The remainder involved two or three incidents similar to the one that defendant experienced—the threatened use of a weapon or fists to take or retain someone else's property. Although evidence of those incidents would have advanced defendant's case, the trial court reasonably could conclude that they would not have added greatly to the evidence already before the jury.

The trial court also identified two potential risks of introducing defendant's evidence. First, the court noted that allowing defendant to prove and the state to disprove Davis's acts towards others would "create a lot of additional evidence that would just become confusing" to the jury. As we understand the trial court, it was concerned about the potential for a series of mini-trials to determine what Davis had or had not done on other occasions and whether it was likely that defendant had or had not known of those acts. Second, the court reasoned that evidence of Davis's crimes towards others could cause the jury to focus on whether Davis "deserved to be killed" rather than on whether defendant intended to injure or kill Davis when he stabbed him. *See* John W. Strong, 1 *McCormick on Evidence* § 193 at 681 (1999) (observing that admitting evidence of victim's bad character poses that risk of prejudice).

Weighing the potential for prejudice against the relevance of defendant's proffered evidence, the trial court explained in some detail why the prejudicial effect of the evidence substantially outweighed its probative value. This court has recognized that "trial judges are granted broad discretion when findings are made on the record to back up this discretionary call." *State v. Mayfield,* 302 Or 631, 647, 733 P2d 438 (1987); *accord Hampton,* 317 Or at 260. Here, the trial court persuasively explained why it reached its conclusion. In light of the weak inference that defendant had any knowledge of Davis's acts towards others, we cannot say that the court abused its discretion.

## STRIKING DEFENDANT'S TESTIMONY

Defendant testified during the guilt phase of the trial. Much of his testimony repeated, in greater detail, evidence that already was in the record. Defendant testified concerning his drug use in prison, recounted his confrontations with Davis, and described how Davis had taken the sunglasses from him at knife point. He testified that, as a result of Davis's actions, he feared him.[7] Defendant also testified concerning the events surrounding the stabbing. He testified that the Lakota Club had not given him the shank. He explained that he had torn a metal bar out of a cart and that "a guy that works out in [the prison] industries * * * took it out and sharpened it, brought it back to me the very next day." Defendant also explained that, if he had wanted to harm Davis, he would not have gone to the Lakota Club for help. He denied that either Graham or the Lakota Club had given him anything in exchange for attacking Davis. Finally, when asked whether he had intended to kill Davis, defendant testified, "No way, no way, never. I wanted to hurt the guy and I wanted the worm—I wanted the wound to be serious and noticeable, but I didn't want that wound to be fatal."

During cross-examination, a question arose concerning defendant's other crimes. The trial court excused the jury, and the state asked defendant a series of questions. Outside the presence of the jury, defendant answered some of the state's questions. He refused, however, to answer three questions. He refused to identify the person who, he testified, had helped him make the weapon that he used to stab Davis. He refused to identify the persons to whom he sold drugs in the prison, and he refused to identify the persons who supplied him with those drugs. The trial court advised defense counsel that, "if [defendant] refuses to answer the questions on cross-examination, then his testimony will be stricken." The court added, "I don't know if you want to talk to him, but that's the rule."

---

[7] Defendant did not testify concerning the remainder of his theory of the case; that is, he did not testify that he understood that, if he only injured Davis, Davis would refuse to identify who stabbed him and that the prison officials would be forced to transfer Davis to another facility to protect him from future attacks. That evidence came in through other witnesses.

The trial court gave defense counsel an opportunity to speak privately with their client. The court then confirmed that defendant understood that, if he refused to answer the three questions, the court would strike his testimony. After the court had clarified defendant's position, one of defendant's counsel noted that "there is another issue which arises, and that is whether striking all of the testimony is the appropriate remedy." Counsel directed the court's attention to a Court of Appeals case and explained that the decision whether to strike all of defendant's testimony "rests with the discretion of the court."

Having considered defense counsel's arguments, the trial court advised counsel that it was going to tell the jury that it was striking defendant's testimony but, if defendant changed his position over the weekend, to let the court know. The court then called the jury in and told them:

> "The State is unable to cross-examine the defendant on all of his direct testimony; therefore, the defendant's entire testimony is stricken. You're not to consider it in your deliberations at all."

After the court gave the jury that instruction, it excused them for the weekend, and defendant moved for a mistrial because "the remedy employed by this court in striking all of the defendant's testimony is greater than that which would be necessary to redress the harm addressed by the state's inability to cross-examine him on the particular points that were made." The court denied the motion.

When the trial resumed, the trial court returned to its decision to strike defendant's testimony. The court explained to the parties that it had reviewed the case that defense counsel had provided "regarding the court's options, which was striking the defendant's [witness's] testimony, and although the—that case discussed that you could maybe parcel out, you know, some parts of the testimony, in that particular case the court struck [all of] the defendant's witness['s] testimony." The court explained that, having reviewed the case and reconsidered the issue, it adhered to its ruling striking defendant's testimony.

Defendant raises three issues on review. First, he argues that the trial court erroneously believed that, once he refused to answer the state's questions on cross-examination, the court's only option was to strike his testimony. Second, he argues that the trial court abused its discretion because striking his testimony was not necessary to remedy the harm caused by his refusal to answer the questions. Finally, defendant argues that striking his testimony was "arbitrary and disproportionate under the federal constitution." We begin with defendant's subconstitutional arguments.

■　　Defendant argues initially that the trial court failed to recognize that it had discretion either to strike his testimony or impose a less onerous remedy when he refused to answer the state's questions. He contends that the trial court's decision rests on a misapprehension of the law. *See State v. Rogers*, 330 Or 282, 310-11, 4 P3d 1261 (2000) (addressing comparable problem).

■　　The premise of defendant's argument is correct. In Oregon, trial courts have broad discretion to control the order and presentation of evidence. *See* OEC 611 (stating that courts shall exercise reasonable control over order and presentation of evidence); *Rogers*, 330 Or at 300 (recognizing that principle). That includes the discretion to strike the testimony of a witness who refuses to answer questions on cross-examination or to impose a less onerous sanction when appropriate. *See State v. Mende*, 304 Or 18, 21, 741 P2d 496 (1987) (holding that, although not required to do so, trial court had discretion to strike defendant's affidavit when he refused to submit to cross-examination).

Although defendant's premise is correct, he errs in asserting that the trial court misperceived the scope of its authority. The trial court expressly recognized that it either could strike defendant's testimony or impose a lesser sanction, if appropriate, to cure defendant's refusal to answer questions on cross-examination. Although the trial court's initial remarks might have suggested a different understanding, the court's later statements reveal that it correctly understood the scope of its authority.

Defendant advances a second argument. He contends that only one of the questions that he refused to answer

went to the merits of his testimony and that two of the questions concerning drugs were merely collateral. In defendant's view, his failure to answer those questions did not prejudice the state in a way that would warrant striking all of his testimony. The state responds that defendant did not preserve the question whether the trial court should have imposed a lesser sanction and that, if he did, the trial court acted within its discretion in assessing the effect of defendant's refusal to answer on the state's right to test defendant's testimony on cross-examination.

■    We begin with the state's preservation argument. *See State v. Wyatt*, 331 Or 335, 15 P3d 22 (2000) (considering preservation first). In *Wyatt*, the court explained that a party's "failure to object to the particular sanction imposed by the judge or, in the alternative, to argue for some other sanction, fails to preserve a claim on appeal that the judge erred in failing to consider the availability of a less onerous sanction." 331 Or at 343 (footnote omitted). Here, defendant objected to the particular sanction that the trial court imposed. Although defendant did not propose lesser sanctions, *Wyatt* does not require that he do so to preserve the issue. We accordingly turn to the merits of defendant's second argument.

■    The court has held that, when a witness's death during a civil trial prevented the opposing party from cross-examining her, the trial court could either strike the witness's direct testimony or declare a mistrial. *Best v. Tavenner*, 189 Or 46, 54, 218 P2d 471 (1950). More recently, the court has recognized that, although not required to do so, a trial court may strike a criminal defendant's testimony who refuses to submit to cross-examination. *Mende*, 304 Or at 21. The court has not had occasion until now to identify the principles that should guide a court's discretion when a party refuses to answer only some cross-examination questions. We turn to that question.

■    A criminal defendant has both a statutory and a constitutional right to testify in his or her own defense. *See* ORS 136.643 (statutory right);[8] *State v. Lotches*, 331 Or 455, 483 n

---

[8] ORS 136.643 provides, in relevant part:

"In the trial of * * * a person accused or charged with the commission of a crime, the person so charged or accused shall, at the own request of the person,

10, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001) (recognizing defendants' state and federal constitutional rights to testify).[9] As the court has recognized, however, a criminal defendant's right to testify is subject to the state's right to cross-examine him or her. *See Mende*, 304 Or at 21. ORS 136.643 expressly conditions the defendant's right to testify on the state's right of cross-examination, and defendant does not argue that either the state or federal constitution prohibits the legislature from imposing that condition. Such an argument would be difficult to mount. *See Rogers*, 330 Or at 301-02 (recognizing that rights under Article I, section 11, are subject to reasonable limitations); *Brown v. United States*, 356 US 148, 154-56, 78 S Ct 622, 2 L Ed 2d 589 (1957) (recognizing that criminal defendant's right to testify is subject to cross-examination).

"For two centuries past, the policy of the Anglo-American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law." John Henry Wigmore, 5 *Evidence in Trials at Common Law* § 1367, at 32 (Chadbourn rev 1974). As this court has explained, "[i]t is axiomatic that a party against whom a witness is called has the right to cross-examine the latter." *Best*, 189 Or at 53. And the United States Supreme Court has stated that a criminal defendant "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." *Fitzpatrick v. United States*, 178 US 304, 315, 20 S Ct 944, 44 L Ed 1078 (1900). These decisions, as well as ORS 136.643, reflect the considered judgment

"that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (unless

but not otherwise, be deemed a competent witness[.] * * * The defendant or accused, when offering testimony as a witness in the own behalf of the defendant, gives the prosecution a right to cross-examination upon all facts to which the defendant or accused has testified and which tend to the conviction or acquittal of the defendant or accused."

[9] In *Lotches*, the court noted that, in addition to the federal constitution, Article I, section 11, of the Oregon Constitution gives criminal defendants a right to testify in their own behalf. 331 Or at 483 n 10. *But see Rogers*, 330 Or at 298-99 (holding that right to be heard in Article I, section 11, incorporates framers' contemporaneous understanding, which did not recognize criminal defendant's right to testify).

by special exception) should be used as testimony until it has been probed and sublimated by that test."

Wigmore, 5 *Evidence in Trials at Common Law* § 1367 at 32.

It follows that, when a witness refuses to submit to any cross-examination or to answer cross-examination questions necessary to test the witness's direct testimony, that refusal undermines the trier of fact's ability to rely on the witness's direct testimony. In those circumstances, the courts generally have recognized that a trial court may strike the witness's testimony. *See* John W. Strong, 1 *McCormick on Evidence* § 19 at 88 (5th ed 1999) (summarizing cases). Not every refusal to answer a question on cross-examination undermines the reliability of the evidence, and some courts have held that, when a witness refuses to answer "cross-examination questions which are logically relevant only to the witness's credibility and otherwise immaterial, the direct testimony should not be stricken or * * * at the least the judge ought to have a measure of discretion in ruling on that matter." *See id.* at 89 (summarizing cases).

The decision in *United States v. Cardillo*, 316 F2d 606 (2d Cir), *cert den*, 375 US 822, 375 US 857 (1963), which we find persuasive, illustrates those principles. In *Cardillo*, two members of a conspiracy to sell stolen goods testified for the government against their coconspirators. The defendants cross-examined one witness by asking whether he had "committed other crimes in the past and whether he was guilty of certain crimes with which he was then charged in the state courts." *Id.* The witness invoked his right against self-incrimination, and the Second Circuit held that the trial court correctly declined to strike the witness's direct testimony. *Id.* It reasoned that the questions related solely to the witness's credibility and "had no relation to the subject matter of his direct examination." *Id.*

The court reached a different conclusion when another government witness refused to answer a cross-examination question that related to the subject matter of his testimony. That witness testified that he gave $5,000 to the defendants so that they could buy the stolen property. *Cardillo*, 316 F2d at 612. When asked where he had obtained

the money, the witness replied that he had borrowed it from "a friend." *Id.* When the defendants asked the witness on cross-examination to name the friend, the witness refused to answer. *Id.* The defendants argued that, if the witness had named his "friend" and if they could prove that the witness had not borrowed the money from that person, they could impeach the witness's testimony. *Id.*

In explaining why the refusal to answer this cross-examination question warranted striking the witness's direct testimony, the court reasoned:

> "[D]espite the original claim that [the witness's] proposed cross-examination related to 'credibility,' it was not the type of testimony that would have developed the general unsavory character of the witness as might questions dealing with prior convictions. The answers solicited might have established untruthfulness with respect to specific events of the crime charged. It is in this field that the decisions appear to call for the striking of testimony."

*Cardillo,* 316 F2d at 613. As the court explained, the "financial transaction [that the defendants had sought to inquire about on cross-examination] was not collateral but directly related to [the defendants'] participation in the conspiracy." *Id.* at 612. In those circumstances, the court held that the trial court should have stricken the direct testimony. *Id.* at 613.

Applying those principles, we conclude that the trial court did not abuse its discretion in striking defendant's testimony. Defendant's refusal to identify the person whom he claimed had sharpened the metal rod for him bore directly on his intent—the primary issue in the guilt phase. The state had presented evidence that the Lakota Club had made and given defendant a shank, in addition to tobacco and heroin, to kill Davis. Defendant testified that the Lakota Club had nothing to do with the homicide, that the club had not given him the shank, and that another inmate had helped him make it. If defendant had identified the inmate who, he testified, had helped him make the shank, the state could have tested the truthfulness of defendant's claim that he had not stabbed Davis pursuant to any agreement to kill him.

The other two questions that defendant refused to answer also bore on his intent. One of the members of the Lakota Club had testified that, in return for defendant's agreement to kill Davis, the club and Graham had given defendant tobacco and heroin two to three weeks in advance of the homicide so that defendant could "get high, smoke cigarettes, sell some heroin and raise some money" before the stabbing. Defendant, however, refused to identify who bought drugs from him and who supplied the drugs he sold. Defendant also denied receiving tobacco and heroin from the Lakota Club or Graham. If defendant had answered the questions that the state posed to him on cross-examination, the state would have been able to test, either as a result of the timing of his drug sales or by questioning the suppliers he identified, whether defendant truthfully denied receiving any heroin or tobacco from Graham and the Lakota Club. Put another way, defendant's refusal to answer denied the state the opportunity to test his claim that he had no connection to any agreement to kill Davis.

Defendant refused to answer those questions knowing the consequences of his decision. He did not object to the questions at trial; the state's questions related directly to the events of the charged crime; and the answers to those questions were necessary to a complete cross-examination. Defendant's refusal to answer prejudiced the state's ability to test the details of his direct testimony, and the trial court acted within its discretion in striking his testimony.[10]

■ Finally, citing *Rock v. Arkansas*, 483 US 44, 107 S Ct 2704, 97 L Ed 2d 37 (1987), defendant argues that striking

---

[10] *State v. Mai*, 294 Or 269, 656 P2d 315 (1982), is consistent with this decision. In *Mai*, the court upheld the trial court's ruling precluding the defendant's witness from testifying because the defendant had refused to comply with the discovery statutes. *Id.* at 279-80. The court recognized that preclusion "should be imposed only when no lesser sanction would accomplish the aim of the [discovery] statute." *Id.* at 277. The defendant, however, had refused to provide discovery after being ordered to do so, and his refusal had prejudiced the state. In those circumstances, preclusion was appropriate. *Id.* at 279-80. Here, defendant's refusal to answer the state's cross-examination questions prejudiced the state's ability to test the truth of defendant's testimony in much the same way that the defendant's refusal to provide discovery prejudiced the state in *Mai*.

his testimony violated due process.[11] In support of that claim, defendant notes that the state did not ask other inmate witnesses to name the persons who used drugs in prison. He also notes that the state did not seek to strike the testimony of three inmate witnesses who testified that, if asked, they would not identify who traded contraband in the prison. Defendant reasons that the trial court arbitrarily treated him differently from other witnesses in violation of due process.

The initial problem with defendant's constitutional argument is its premise—that the state arbitrarily treated him differently from other witnesses. As noted, the state asked defendant about the persons to whom he sold drugs and the persons who supplied him with drugs to test his claim that he had received no heroin or tobacco from Graham and the Lakota Club in exchange for killing Davis. The state had no reason to ask other inmates who testified about that issue. There was no evidence (or suggestion) that those witnesses had received drugs from Graham or the Lakota Club as part of an agreement to kill Davis. Although the state asked defendant different questions than it asked the other witnesses, its decision to do so was reasonable. Because the premise of defendant's claim fails, so does the claim.[12]

## A WITNESS'S COMMENT ON DAVIS

During his case-in-chief, defendant introduced evidence that he had reason to fear Davis. On rebuttal, the state called a witness who testified that, over the course of several conversations, he heard defendant tell another inmate that

---

[11] In his brief, defendant asserts that the trial court's ruling "implicates" Article I, section 11, of the Oregon Constitution and the Fifth, Sixth, and Eighth Amendments to the United States Constitution. Defendant does not explain why the trial court's ruling violated those rights. We decline to address defendant's undeveloped constitutional claims and limit our discussion to the single constitutional argument that he made in his brief. *See State v. Thompson*, 328 Or 248, 254 n 3, 971 P2d 879, *cert den*, 527 US 1042 (1999) (declining to reach undeveloped constitutional claims).

[12] Given our disposition of defendant's federal claim, we do not decide whether defendant may convert what appears at bottom to be an unequal treatment claim against the state into a due process claim that the trial court's ruling was arbitrary. *See Rock*, 483 US at 62 (holding that absolute prohibition against hypnotically refreshed testimony arbitrarily infringed federal right to present defense).

he was angry at Davis, that he intended to retaliate against him, and "that he was seriously thinking about shanking [him]." The state then asked:

> "Q. During any of these conversations did [defendant] ever express any fear towards Mark Davis?
>
> "A. I'm sorry. No.
>
> "Q. You laugh. That seems a little unusual. Why—why are you laughing?
>
> "A. Because [Davis] was a fly. It would be like a fly being scared of a spider or—you know."[13]

Defense counsel moved to strike the witness's answer. He also moved for a mistrial on the ground that referring to Davis as a fly constituted impermissible character evidence. Finally, counsel argued that, because the witness's testimony had opened the door, defendant was free to introduce evidence of Davis's violent acts towards others.

The trial court denied defendant's motion to strike and his motion for a mistrial. It also adhered to its earlier ruling that defendant could ask about Davis's violent acts towards him but not about Davis's violent acts towards others. On review, defendant assigns error to the trial court's rulings denying his motion to strike, denying his motion for a mistrial, and limiting his rebuttal evidence. However, in his argument, defendant does not identify any reason why the evidence was inadmissible; that is, he does not identify any reason why the court should have struck the witness's testimony or declared a mistrial. Rather, defendant's argument assumes that the evidence was admissible and focuses on whether the court erred in limiting the rebuttal evidence.

The difficulty with defendant's argument is that the witness's statement did not interject a new issue into the case. The trial court previously had recognized that the question whether defendant feared Davis was part of the case, and the witness's comparison of defendant and Davis merely provided additional evidence on that question. We have held

---

[13] The witness presumably meant to say that defendant being scared of Davis was like a spider being scared of a fly.

that the trial court did not abuse its discretion in limiting evidence of Davis's other crimes to prove that defendant feared Davis. Nothing in the witness's answer changes that conclusion.[14]

## PLEADING SENTENCING FACTS IN THE INDICTMENT

■ The grand jury indicted defendant for committing aggravated murder. The indictment does not refer, however, to the facts that a jury must find in the penalty phase before it can decide whether to impose the death penalty. Defendant argues that, under *Ring v. Arizona*, 536 US 584, 122 S Ct 2428, 153 L Ed 2d 556 (2002), those facts must be pleaded in the indictment. Defendant did not raise this issue below but asks us to review it under the plain error doctrine. ORAP 5.45(6). Defendant acknowledges that the court has rejected similar unpreserved claims, *see State v. Oatney*, 335 Or 276, 297, 66 P3d 475 (2003), *cert den*, 540 US 1151, 124 S Ct 1148 (2004) (illustrating proposition), but contends that the United States Supreme Court's recent decision in *Blakely v. Washington*, 542 US ___ , 124 S Ct 2531, 159 L Ed 2d 403 (2004), demonstrates that this court's earlier decisions are incorrect.

■ As a matter of state procedural law, a state appellate court will reach an unpreserved issue only if the error is both apparent on the face of the record and if it is appropriate, in the exercise of the court's discretion, to reach the issue. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991) (explaining plain error doctrine). An error is apparent if it is "obvious, not reasonably in dispute." *Id.* at 381. Having reconsidered defendant's argument in light of *Blakely*, we reaffirm that the error that defendant perceives is not apparent. We do not decide whether, if it were, we would exercise our discretion to reach it.

---

[14] Defendant argues that the trial court's refusal to allow him to introduce other crimes evidence violates his right to cross-examination under both Article I, section 11, of the Oregon Constitution and the Sixth Amendment. Both rights are subject to reasonable limitations. *See Rogers*, 330 Or at 301 (so stating); *Delaware v. Van Arsdall*, 475 US 673, 679, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (same). The restrictions that the trial court imposed stayed within constitutional bounds.

In *Apprendi v. New Jersey*, 530 US 466, 476-78, 120 S Ct 2348, 147 L Ed 2d 435 (2000), the Court held that a state criminal defendant has a Sixth Amendment right to have a jury decide certain facts that affect the defendant's sentence and a Fourteenth Amendment due process right to have the state prove those facts beyond a reasonable doubt. The Court was careful to limit its holding to those two rights. The Court noted:

> "Apprendi has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment. He relies entirely on the fact that the 'due process of law' that the Fourteenth Amendment requires the States to provide to persons accused of crime encompasses the right to a trial by jury and the right to have every element of the offense proved beyond a reasonable doubt. That Amendment has not, however, been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' that was implicated in our recent decision in *Almendarez-Torres v. United States*, 523 US 224 (1998). We thus do not address the indictment question separately today."

*Id.* at 477 n 3. In *Ring*, the Court again noted and reserved this issue. 536 US at 597-98 n 4.

The quoted passage from *Apprendi* implies that, if defendant has a federal constitutional right to have a fact pled in the indictment, that right derives solely from the Fifth Amendment. The decision in *Blakely* does nothing to change that suggestion. In *Blakely*, the Court stated that the question presented was whether the state had violated the defendant's Sixth Amendment right to a jury trial. 124 S Ct at 2534. The defendant did not argue that the indictment should have pled the facts that enhanced his sentence, and the Court did not address whether the Fifth Amendment right to "presentment or indictment of a Grand Jury" applies to the states through the Fourteenth Amendment. *See id.* at 2539 (basing decision on Sixth Amendment). If the Court has not decided whether the Fourteenth Amendment incorporates the Fifth Amendment right upon which defendant's claim appears to depend, the federal constitutional error that defendant perceives cannot be described as apparent, obvious, or not reasonably in dispute. *See Ailes*, 312 Or at 381-82

(describing apparent error).[15] As a matter of state procedural law, defendant's unpreserved federal constitutional claim is not properly before us.

## CONFRONTATION CLAUSE CLAIMS

Defendant identifies 15 instances during his trial in which witnesses testified concerning another person's out-of-court statements. Defendant argues that admitting this testimony violates his rights under the federal Confrontation Clause. *See Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004) (interpreting Confrontation Clause). Defendant did not object to this testimony below but argues that we should reach his federal constitutional claims under the plain error doctrine. The state responds that the challenged statements do not constitute plain error. It notes that some statements defendant now challenges are not hearsay. Other statements, it contends, are not "testimonial" and thus do not raise Confrontation Clause issues under *Crawford*. Alternatively, the state argues that, even if some of the statements are testimonial and the error is apparent on the face of the record, we should not exercise our discretion to reach it.

As noted above, as a matter of state procedural law, an appellate court will reach an unpreserved issue only if the error is apparent on the face of the record and if it is appropriate, in the exercise of the court's discretion, to reach the issue. *See Ailes*, 312 Or at 381 (explaining plain error doctrine). Even if we assume that the error is plain, this is not an appropriate occasion to reach it. As the state notes, if defendant had raised a timely objection, the state could have found other ways to prove the facts that defendant now challenges, or it could have chosen to forego the testimony and avoid the issue. In these circumstances, we decline to exercise our discretion to reach the unpreserved issues that defendant asks us to decide. *See id.* at 382 (explaining courts' discretion not to reach apparent errors). Having considered the issues that

---

[15] We need not decide whether, as the footnote in *Apprendi* appears to suggest, defendant's federal claim that the indictment should have pled facts that enhance his sentence derives solely from the Fifth Amendment. It is sufficient to say that, in light of that note, the federal source of defendant's claimed error is also unclear.

defendant's assignments of error raise, we affirm the judgment of conviction and sentence of death.

The judgment of conviction and sentence of death are affirmed.