ORTEGA, P. J.
*82 *304 Petitioner, an inmate at Oregon State Penitentiary (OSP), was convicted of aggravated murder and possessing a weapon in a correctional institution, ORS 163.095(2)(b) ; ORS 166.275, for the fatal prison-yard stabbing of Davis, another inmate. Petitioner was sentenced to death and, on direct review, the Supreme Court affirmed those convictions and the penalty. State v. Cox , 337 Or. 477, 98 P.3d 1103 (2004), cert. den. , 546 U.S. 830, 126 S.Ct. 50, 163 L.Ed.2d 81 (2005). Petitioner now appeals the judgment of the post-conviction court rejecting claims of inadequate and ineffective assistance of trial counsel during the guilt and penalty phases.
Petitioner raises numerous assignments of error on appeal, but we address only one. That assignment relies on the post-conviction court's finding that McPhail, a witness for the state, lied at petitioner's criminal trial. McPhail testified during the guilt phase that petitioner's killing of the victim was part of a murder-for-hire conspiracy involving another inmate (Graham) and members of the Lakota Club, which is a club for Native Americans incarcerated at OSP to socialize and participate in religious ceremonies. At petitioner's post-conviction trial, McPhail testified that he made up the murder-for-hire plot, and the court found that that testimony was closer to the truth than his testimony at the criminal trial. In petitioner's view, his defense counsels' failure to investigate before trial McPhail's conspiracy assertion resulted in the failure to call witnesses at trial who could have refuted the state's murder-for-hire theory. That failure, he contends, meant that his defense counsel were constitutionally inadequate and ineffective. Reviewing for legal error and bound by the post-conviction court's findings of historical fact if supported by evidence in the record, Montez v. Czerniak , 355 Or. 1, 8, 322 P.3d 487, adh'd to as modified on recons. , 355 Or. 598, 330 P.3d 595 (2014), we agree with petitioner that defense counsel failed to investigate McPhail's claims and that, had counsel done so, they would have called a prison official familiar with the Lakota Club who would have contradicted McPhail's claims. Accordingly, defense counsels' representation was inadequate under Article I, section 11, of the Oregon Constitution, and we consequently *305 reverse and remand the post-conviction judgment as to the aggravated murder conviction.[1]
In the prison yard at OSP, petitioner fatally stabbed Davis, pushing a shank almost five inches into Davis's back, with such force that it lifted Davis to his toes. That petitioner stabbed Davis was not in dispute.[2] What was disputed was whether petitioner intentionally killed Davis; petitioner's defense theory was that, because Davis had previously threatened to kill and had pulled a shank on petitioner, petitioner meant only to injure Davis-to give him the "worm," as they say in the facility-so that prison officials would transfer Davis to another facility for his protection.[3] At most, petitioner argued, he was *83 only guilty of manslaughter. The state, on the other hand, advanced a theory that petitioner had a combination of two motives for intentionally killing Davis: (1) petitioner, who was considered a "heavyweight" convict (an inmate who demanded respect) at OSP, killed Davis-who had pulled a shank on petitioner and owed him money-in order to maintain his status within the prison; and (2) petitioner was paid $ 5,500 in drugs by the Lakota Club to kill Davis, who had "burned" the club and Graham in their illicit tobacco and heroin dealings at OSP.[4]
The murder-for-hire plot involving the Lakota Club-described by the post-conviction court as the "critical issue" in petitioner's claims of inadequate assistance of counsel-is *306 the focus of this appeal.[5] We therefore begin with the testimony of McPhail, the only inmate witness who testified directly about the murder-for-hire theory. At trial, McPhail claimed that two of the club's members, Pope and Kentta, sharpened a shank on the concrete floor of the clubhouse while he kept watch. He described Davis's exchange of heroin for tobacco with the Lakota Club and said that Davis lied to the club about obtaining heroin from Graham rather than a guard, and that Davis lied to Graham about obtaining tobacco from the Lakota Club rather than a guard. McPhail further testified that Davis was late in repaying the club with heroin, therefore "burning" the club. McPhail explained that, consequently, the club coordinated with Graham to arrange for petitioner to stab Davis, and that he instructed Pope to deliver the shank to petitioner and to relay instructions on how to stab Davis (below the ribs and in the liver).
Throughout his testimony, McPhail spoke of his role as the club's "war chief"-that he was "second in command" to the club's chief, Kentta, and that prison officials believed he was responsible for setting up sports activities and the protocol for the club's religious ceremonies but that his actual job was to mediate between club members, be the "first one in line" to fight nonclub members, and to pass out weapons or use weapons himself. The state asked McPhail, "as a result of being in this position of being second in command, were you also aware of the illegal-the tobacco smuggling, the drug sales that the club was involved in?" McPhail answered that he was, and that, as the club's "war chief," he had experience assaulting other inmates, which explained his ability to instruct Pope on the proper way to stab another person.
Petitioner was represented by Bostwick and Grefenson. On cross-examination, Grefenson made efforts to impeach McPhail, namely by questioning McPhail's assertions about having assaulted multiple inmates; by pointing out, and getting McPhail to admit, that he lied to investigators *307 initially about not knowing about the Davis stabbing and that McPhail's understanding of the events changed from hearing rumors to being involved in a plot to kill Davis; and by pointing out that McPhail did not fully admit to participating in the claimed conspiracy until six or seven weeks before trial. Grefenson also elicited acknowledgement from McPhail that he had not been charged with murder for his involvement in the conspiracy and that he had asked for a transfer from Eastern Oregon to the Willamette Valley to be closer to his family.
After McPhail's testimony, the state called as a witness the lead detective for the murder investigation, Duvall. Among other things, Duvall testified to the investigative contacts and interviews with McPhail, noting that the first two times McPhail was interviewed, *84 he had "nothing of substance" to say about the Davis stabbing. At McPhail's third interview, Duvall explained, McPhail informed him that he was in the Lakota Club clubhouse when the shank was being made and that the weapon was to be used to kill someone but he did not say who; that Davis owed petitioner money; that he overheard another inmate, Pope, tell petitioner how to stab Davis with the shank; and that shortly before the stabbing took place he learned that the victim was to be Davis. Duvall also explained that McPhail described himself as the Lakota Club's war chief and that he was tired of doing things as the war chief that kept him in the "convict code" and in prison. Duvall also testified that, in a follow-up interview later that month, McPhail stated that he knew that the shank was made in the clubhouse, that it was intended to be used against Davis and, for the first time, he introduced Graham as a participant in drug dealings with the club and Davis.
On cross-examination, Duvall acknowledged again that McPhail had initially denied any knowledge or involvement in the stabbing. Petitioner's defense counsel pointed out that Duvall had testified that McPhail, in the beginning, "emphatically denied having any information about the case at all," and Duvall acknowledged (as he had on direct) that initially McPhail had not spoken of a conspiracy, but later provided details of participating in the conspiracy. Specifically, counsel pointed out that McPhail had *308 said that, after the stabbing happened, McPhail overheard Pope talking about how Pope had told petitioner where to stab Davis, and how that was inconsistent with McPhail's trial testimony that he had himself instructed Pope where to stab Davis before the stabbing occurred. Petitioner's defense counsel elicited testimony from Duvall recounting how McPhail's statements to investigators had progressed from "rumor" about participants in the fatal stabbing to actually witnessing conversations and planning.
Before defense counsel proceeded with their case, the trial court inquired about counsels' readiness to proceed. Counsel indicated that they did not have their own witness list and, when pressed, indicated that they could potentially call back three of the state's witnesses, including McPhail and Duvall, and otherwise needed time to interview and prepare their witnesses. The trial court evinced surprise, given that the case had been pending for a year and a half; the court indicated disbelief that defense counsel had "not talked to these people" or had "investigators talk to these people."
As relevant here, defense counsel called witnesses, including petitioner, to support a manslaughter theory. Among those witnesses, defense counsel called Pope, a member of the Lakota Club and one of the people whom McPhail had implicated in the murder-for-hire plot. Pope disputed McPhail's contention that Lakota Club members were involved in a plot to kill Davis, and denied ever having provided or even seen the shank that petitioner used to kill Davis. He further explained that he was unaware of any club member sharpening the shank in the club and expressed why he would not have participated in such a thing. Pope also explained that members of the Lakota Club would never have used a white inmate like petitioner to conduct its illicit business. According to Pope, inmates "stay within their own" for their business dealings. Pope also disputed McPhail's claim that he was the "war chief" of the Lakota Club.
On cross-examination, the prosecutor asked Pope, who was already serving time for aggravated murder, if he knew that he was "potentially looking at capital murder * * * for supplying the weapon that was used to kill * * * Davis."
*309 The state also elicited testimony from Pope that his own overture to police to provide help with the Davis murder investigation had been rebuffed, and that testifying about another inmate could put him in physical jeopardy.
After a jury trial in two phases (guilt and penalty phases), petitioner was convicted of the charges and sentenced to death. Defense counsel filed a motion for a new trial based on an irregularity in the proceedings, i.e. , the inconsistencies in McPhail's police interviews and his trial testimony, arguing that prosecutors should have known that McPhail's testimony was perjured and that no grand jury proceedings for aggravated murder had been *85 initiated against McPhail, Graham, Kentta, and Pope. That is, the crux of their argument was that the prosecution had violated ethical rules and petitioner's constitutional rights by presenting McPhail as a witness to testify about the murder-for-hire scheme. The court denied the motion.[6]
Petitioner appealed that conviction and, on direct review, the Supreme Court affirmed. Cox , 337 Or. at 479, 98 P.3d 1103. At some point, McPhail communicated by affidavit that he had lied about the murder-for-hire plot at petitioner's trial. Petitioner sought post-conviction relief, claiming, among other things, that his trial counsel were constitutionally inadequate because they failed to adequately investigate, locate, interview, and prepare witnesses that would have, among other things, refuted McPhail's claim that he was the war chief or an officer of the Lakota Club and that, although defense counsel were aware that the state would call McPhail as a witness, they failed to interview McPhail or other witnesses who would have impeached his testimony, and failed to conduct an adequate cross-examination of McPhail.
McPhail testified at the post-conviction trial that his testimony at petitioner's criminal trial was "entirely made up." He said that he lied about being "war chief" and about standing watch in the club room while the murder weapon was being made; weapons would not have been allowed to be made in the club room, because doing so would *310 jeopardize the club and its members. McPhail also admitted that the club would never have hired a white inmate; "[i]f it was Native business, it would have been handled by Native people." In fact, McPhail testified, he knew little of the fatal stabbing. That is, he had "an idea" of what happened, but was not "privy to any of the * * * information exactly why it happened or anything." When asked how he had learned enough to make up the murder-for-hire story, he replied that he had heard some things through the prison "grapevine" and that a prison captain, one of the prosecutors, and Duvall "pretty much hand-fed [him] everything [he] needed to know; and, from there, I just adjusted my testimony."
Several inmates who did not testify at petitioner's criminal trial corroborated McPhail's post-conviction testimony. As relevant to the murder-for-hire theory, those witnesses testified that, if they had been asked about McPhail, they would have provided the following information to defense counsel or their investigators, or at the criminal trial:
• Ollison, a Native American who had many Native friends at OSP, testified that McPhail was not the club's "war chief"; although a Native, he was laughed about by his Native friends and shunned because, among other reasons, he was a homosexual. Defense counsel did not interview Ollison until he was transported to Salem for the criminal trial, and Ollison testified that, by the time he arrived at Salem for the trial, he was confused, agitated, and in a "rough emotional state."
• DeFrank, an inmate, attested by affidavit that the Lakota Club would never have a hired a "white dude." Defense counsels' investigator interviewed DeFrank, learning that DeFrank contradicted statements by Lust, a witness who testified for the state.
• Dennis, a member of the Lakota Club and in custody at OSP when Davis was killed, testified that McPhail was not the war chief and that the club would not have enlisted a white inmate do its "dirty *311 work" because "we take care of our own things" and it would make the club look weak.
• Hill, a Lakota Club member, testified that McPhail was not on the club's council, much less its "war chief." Hill testified that, "[e]ven before McPhail turned State's witness he was universally held in low regard by the Native American inmates because of his open homosexuality and reputation for scamming." Hill was never interviewed by defense counsels' investigators or by defense counsel.
• Allen, a Lakota Club member, testified that defense counsels' investigator had *86 interviewed him, and that McPhail was neither on the club's council nor its war chief.
• Kentta, a member and the elected chief of the club, testified that McPhail was neither war chief nor a council member because McPhail was a homosexual, not trusted, and was known for being a liar. Further, according to Kentta, no one from the club was involved in the killing and the club would have taken care of its own business.
The post-conviction court found that, except for Hill, all of those witnesses were contacted by the "defense team."[7]
At the post-conviction trial, Geer, a prison official who was responsible for oversight of the Lakota Club when Davis was stabbed, testified to what he would have testified to had he been called as a witness at petitioner's criminal trial. According to Geer, many of the Native inmates at OSP viewed McPhail as a "parasite" and as not trustworthy. Further, McPhail "never held office of any kind in the Lakota Club." Geer also testified that it was his understanding that the Lakota Club would not have involved a white inmate in its "business dealings"; he could not recall the Lakota Club ever going outside of the club's core group *312 of members to accomplish anything "shady." The "core group" members "are very, very inward oriented that way," Geer testified, and would keep their business dealings "in house." On cross-examination, the state asked Geer if he was talking about the "club as a whole" and whether Geer could say that not any "particular member of the Lakota Club would follow" the club's prohibition against using non-members to conduct its business dealings. Geer answered that he could not testify to whether an individual member of the club would involve a white inmate in his business dealings.
The state called Bostwick, one of petitioner's trial attorneys, to testify. Bostwick testified that he learned of the murder-for-hire theory shortly before trial-"weeks, maybe a couple of months." Bostwick testified that he did not recall any investigation into the theory, but thought they had attempted to discredit it by pointing out McPhail's inconsistent statements. Grefenson, petitioner's other trial attorney, said in deposition testimony that the "whole murder-for-hire theory was something that I felt came up right before trial and was disingenuous." Further, Grefenson testified that he had read the police reports implicating McPhail, but that the murder-for-hire theory was something that "came to fruition close to the trial" and that he was "pretty surprised that the prosecution actually pinned its case on" McPhail. Grefenson did not recall directing defense counsels' investigators to interview members of the Lakota Club about McPhail's involvement with the killing. For his part, Bostwick had no recollection of interviewing Ollison, DeFrank, Dennis, Hill, or Allen. About Kentta, Bostwick testified that he remembered that Kentta was an officer in the club and involved in the case, but did not have any recollection beyond that.
In a lengthy letter opinion, the post-conviction court rejected all of petitioner's claims. Importantly, the court found that McPhail had never been the Lakota Club's "war chief" and that it was "unlikely that a Native American club would have hired [petitioner] to do its business." Moreover, the court found that the state "relied heavily on McPhail's testimony" and that the state's comments in opening and closing arguments, and in its appellate brief for petitioner's automatic and direct appeal to the Supreme Court, "illustrate that the *313 murder for hire theory was at the heart of the [s]tate's case." Further, it was "clear that the defense did not anticipate that the prosecution would rely on the testimony of * * * McPhail and present a theory of murder for hire. Counsel was surprised in the opening statement." However, with regard to the failure to investigate McPhail's claims and the general quality of the investigation, which would have led defense counsel to call witnesses who would have contradicted McPhail's trial testimony, *87 the court pointed out that many of the witnesses who testified at the post-conviction trial were inmates, and because "inmate witnesses create inherent difficulties for lawyers because inmates change their stories" and there are "many opportunists," it is "difficult to sift out information that is true and information that is just being thrown out there because an inmate wants to gain an advantage somehow." Further, the court concluded that petitioner's sole proof of a failure to investigate McPhail's claims was petitioner's contention that defense counsel failed to interview the witnesses who testified at the post-conviction trial. Because, the post-conviction court found, "counsel did in fact contact, if not interview, the majority of these witnesses, this aspect of [p]etitioner's claims fails for lack of proof."
As for the witnesses themselves, the post-conviction court concluded that defense counsels' decisions were not unreasonable, for a few different reasons. It was reasonable to not call Ollison because of his emotional state; it was too much to ask of reasonable counsel to find Hill among the 250 inmates on the investigation's list of inmates; Dennis was not a credible witness; Allen had "little first-hand knowledge"; and, although Allen would have testified that McPhail was not the "war chief," Pope testified to the same thing at the criminal trial. As for DeFrank and Kentta, the court concluded that defense counsel had good reasons not to call them, essentially because their testimony would do more harm than good. The post-conviction court's findings and conclusions regarding whether counsel was inadequate for not finding and calling Geer to testify were slim. The court credited Geer's testimony, finding that "the Lakota Club would not have gotten an outsider to take care of their business [dealings]," and it agreed with petitioner that *314 Geer "might have provided helpful testimony to impeach McPhail." The court, however, disagreed with petitioner that "counsels' failure to [locate and call] this single witness is by itself inadequate assistance of counsel."
The post-conviction court concluded that, in any event, even if the murder-for-hire theory were or had been discredited, it was unlikely that the jury would not have convicted petitioner of aggravated murder. That is, the court reasoned, the physical evidence of the killing itself was enough for a jury to find the element of intent for the murder and it was unlikely that the jury would have believed that petitioner intended only to wound Davis. However, the court acknowledged that, even though motive is not an element of the crime, it is important to a jury, stating that "human beings tend to evaluate events from a moral perspective and so the jury might have been affected by the difference." See State v. Fong , 211 Or. 1, 25, 314 P.2d 243 (1957) ("Motive is never a necessary element of proof * * *, though it is frequently a very important element when the prosecution is compelled to rely entirely on circumstantial evidence.").
We turn to the relevant law. A petitioner is entitled to post-conviction relief based on inadequate assistance under Article I, section 11, if the petitioner shows two things: (1) that trial counsel failed to exercise reasonable professional skill and judgment and (2) that the petitioner suffered prejudice as a result of counsels' inadequacy.[8] Trujillo v. Maass , 312 Or. 431, 435, 822 P.2d 703 (1991). A petitioner demonstrates prejudice if he shows that his defense counsel's failure had "a tendency to affect the result of his trial." Lichau v. Baldwin , 333 Or. 350, 359, 39 P.3d 851 (2002). More precisely, "because many different factors can affect the outcome of a jury trial, in that setting, the tendency to affect the outcome standard demands more than mere possibility, but less than probability," or in other words, "the issue is whether trial counsel's acts or omissions could have tended to affect the outcome of the case."
*315 Green v. Franke , 357 Or. 301, 322-23, 350 P.3d 188 (2015) (internal quotations, emphases and citations omitted).
As we explain below, this case-as we resolve it on appeal-is one of "failure to *88 investigate." The Supreme Court recently explained the applicable inadequate assistance of counsel standards for such cases in Richardson v. Belleque , 362 Or. 236, 406 P.3d 1074 (2017). There, the petitioner was sentenced as a dangerous offender who suffered from a "severe personality disorder" under ORS 161.725(1), but, during the presentence hearing, the petitioner's defense counsel cross-examined Suckow, a psychiatrist who opined on behalf of the state that the petitioner had a severe personality disorder, without having investigated the petitioner's background or consulting an expert before the hearing. Nor did defense counsel introduce evidence from a defense expert that could have disputed the "severe personality disorder" diagnosis at the hearing. 362 Or. at 238, 406 P.3d 1074. The petitioner sought post-conviction relief, alleging constitutionally inadequate assistance of counsel. At the post-conviction trial, the petitioner adduced a written report from a clinical psychologist, Dr. Cooley, in which Cooley indicated facts and opinion that would have contradicted the state's psychiatrist. The post-conviction court granted relief, concluding that the petitioner's defense counsel had provided inadequate assistance by failing to reasonably investigate and consult with an expert before deciding that cross-examination alone was appropriate and by failing to call a defense expert to rebut the state's psychiatrist witness who had testified that he had diagnosed the petitioner with an antisocial personality disorder. Id. at 248-53, 406 P.3d 1074. The Supreme Court affirmed that decision. Id. at 268, 406 P.3d 1074.
The court explained that, "when a petitioner seeks to establish that counsel failed to exercise reasonable skill and judgment, what constitutes adequate performance is fact-specific and dependent on the 'nature and complexity of the case.' " Id . at 255, 406 P.3d 1074 (quoting Johnson v. Premo , 361 Or. 688, 701, 399 P.3d 431 (2017) ). Further, the court noted the well-settled principle that a reviewing court will not " 'second-guess the lawyer in the name of the constitution.' " Richardson , 362 Or. at 255, 406 P.3d 1074 (quoting Johnson , 361 Or. at 702, 399 P.3d 431 ). However, the court explained that, because a reviewing *316 court must not " 'ignore decisions made in the conduct of the defense which reflect an absence or suspension of professional skill or judgment,' " tactical decisions "must be based on 'a reasonable investigation.' " Richardson , 362 Or. at 255-56, 406 P.3d 1074 (quoting Johnson , 361 Or. at 702, 399 P.3d 431 ); see id . at 257, 406 P.3d 1074 (explaining that the United States Supreme Court, in Wiggins v. Smith , 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), concluded that the necessary predicate to counsel making a decision is an informed choice).
The court also arrived at a formulation of the prejudice prong when criminal defense counsel has failed to adequately investigate before proceeding with a course of action at a presentence hearing. Richardson , 362 Or. at 264, 406 P.3d 1074. Noting that the court in Green rejected a probability standard, it likewise rejected the state's argument that, in a failure to investigate case, a petitioner must prove, as a preliminary step, that " 'it is reasonably probable that a competent attorney would have presented the evidence' that would have been uncovered through an adequate investigation." Id . Instead, with Green instructing that the "tendency to affect the verdict" standard demands more than a mere possibility, but less than probability, the court held that (1) "it was more than a mere possibility that competent defense counsel could have used the information from Cooley's report in ways that 'could have tended to affect' the outcome of the dangerous-offender hearing," (2) "there was 'more than a mere possibility' that counsel could have used that information in cross-examining Suckow or by calling that expert to the stand or doing both"; and (3) "[g]iven the uses to which counsel could put the information from the Cooley report, there was more than a mere possibility that the jury could have rejected the state's contention that petitioner suffered from a 'severe personality disorder.' " Id . at 267-68, 406 P.3d 1074.
Petitioner argues on appeal that the post-conviction court erred by concluding that defense counsel did not render inadequate and ineffective assistance by "failing to obtain and supervise qualified investigators, failing to prepare for trial, and failing to locate, *89 interview, and obtain testimony from numerous easily identifiable witnesses who could have impeached the prosecution's murder-for-hire theory, supported the defense's lack-of-intent-to-kill theory, *317 and undermined the prosecution's penalty-phase case." Included in that assignment are witnesses identified by petitioner who testified at the post-conviction trial but not the criminal trial and who, according to petitioner, would have provided helpful testimony to refute McPhail's claims. We focus our attention here on the alleged failure of defense counsel to address the state's murder-for-hire theory by failing to interview potential witnesses who could have provided information about the Lakota Club and the failure of defense counsel to call Geer as a witness.
The state responds that, even assuming that defense counsel acted deficiently in their investigation, petitioner "cannot establish a basis for relief unless [the deficient investigation] somehow affected counsel's actual performance at trial."[9] (Emphasis supplied by the state.) Thus, the state posits, any failure in the investigation matters only if petitioner identifies and proves some "actual, concrete error or omission that counsel committed at the trial as a result of the failure." In the state's view, that means that the post-conviction court's approach, in which it ruled on the investigation claims by addressing "separately petitioner's claims that his counsel should have contacted and called specific witnesses at trial," was the right one. For each of the witnesses who petitioner argues could have been helpful to refute the state's murder-for-hire theory, the state advances reasons why defense counsel would have made tactical decisions not to call them as witnesses.
Given the nature and complexity of the aggravated murder charge and the information available to defense counsel, we conclude that defense counsels' decision not to investigate McPhail's assertions was not a reasonable exercise of professional skill and judgment. Defense counsel were aware, before trial, that McPhail was recounting a murder-for-hire theory based on his position as "war chief," that investigators had interviewed him multiple times, and that he would be a witness for the state's case against petitioner. Indeed, defense counsel learned of the theory "weeks, maybe a couple of months" before trial, and described their *318 sense that the theory appeared not to be legitimate. The theory as articulated by McPhail in the police interview provided a distinctly different view from what other witnesses were recounting. That theory involved particular claims about how the Lakota Club conducted illegal business (its "business dealings"), whether it would have involved a white inmate in its illicit activities, who some of its officers were, information about other club members, and McPhail's position in the club. Yet, the record does not reflect that defense counsel proceeded to investigate the veracity of those claims, even though McPhail was on the state's witness list. The best explanation defense counsel could provide was that the prosecutors did not inform defense counsel before trial that they would advance the murder-for-hire theory as a critical part of their case. That the prosecutors failed to share how they would proceed with the case, however, did not excuse defense counsel from investigating McPhail's claims in preparation for trial when defense counsel was aware of those claims and believed them to be illegitimate. Accordingly, we conclude that defense counsels' knowledge of McPhail's police interviews and their knowledge that McPhail was on the state's witness list would spur a reasonable attorney to investigate McPhail's claims further to prepare for the capital murder trial.
Specifically, two elements of McPhail's murder-for-hire theory were readily ascertainable as untrue in the course of further investigation: that McPhail was "war chief" and that the Lakota Club would have hired a nonmember to conduct its illicit activities or assault another inmate. In the post-conviction trial, multiple inmates who were Lakota Club members testified contrary to those two aspects of McPhail's story and that they would have been willing to discuss those *90 issues with petitioner's investigators if asked. Those inmates testified that McPhail was not the war chief and was not on the council, and that the reasons that he was not the club's war chief or on the council were that club members saw McPhail as untrustworthy and because he was a homosexual. In other words, McPhail, in his police interviews, said that he, as war chief of the Lakota Club, was privy to the "business dealings" of the club, witnessed the sharpening of the murder weapon, and passed it along *319 to Pope with instructions on how to use it to inflict the most damage-yet the record reflects that neither defense counsel nor their investigators ever interviewed any club members about the veracity of McPhail's story relating to his position in the club or whether he was war chief, or asked about the club's practice of engaging outsiders in its business dealings.
Had defense counsel investigated McPhail's claims, they would have discovered that McPhail was not the war chief and that it was unlikely that the Lakota Club would have hired petitioner to do its "business." With that information, reasonable counsel would have called Geer, who was a prison official, as a witness to refute McPhail's claim that he was the war chief and to testify that it was unlikely that the club would have hired a white inmate to conduct its illicit business.[10] We reject the state's contention that counsel would have had "good reason to steer clear of Geer's testimony" because Geer could not categorically deny that any particular member of the club would not follow the club's custom of not engaging outsiders to do its illicit business. Given that the state's theory was that the Lakota Club hired petitioner to murder Davis and that McPhail, by reason of his position in the club, was able to provide a first-hand account of the theory in his trial testimony, it is unlikely that defense counsel would have been dissuaded from calling Geer as a witness based on the fact that Geer could not rule out, or did not have personal knowledge, that an individual club member would assist petitioner in order to counter some hypothetical plot or involvement with Native American inmates that was different from the one testified to by McPhail, and advanced by the state at trial.[11]
Furthermore, the failure to call Geer as a witness prejudiced petitioner. There was more than a mere possibility that, had defense counsel called Geer as a witness, the *320 jury would have rejected McPhail's testimony that a murder-for-hire plot motivated petitioner to intentionally kill Davis. It is likely that Geer's testimony would have caused the jury to disbelieve McPhail's claim that he was the "war chief" and to conclude that it was unlikely that the Lakota Club would have hired petitioner. We disagree with the state's contention that McPhail's status as "war chief" was a minor point. That claim undergirded his entire testimony. That is, among other things, his position as war chief, according to McPhail, allowed him to witness the shank sharpening as he was standing watch, and, because he had carried out assaults because of his position as enforcer, he said that he had instructed Pope on how to stab Davis to pass on to petitioner. If a jury disbelieved that McPhail was the "war chief," there is little reason that it would believe much else about the murder-for-hire plot.
The state also asserts that, because Pope testified that the club would not engage the services of a white inmate, any additional testimony on that point would have been minor, and thus its absence would not have been prejudicial. Again, we disagree. On cross-examination, the state confronted Pope with (1) the fact of his existing aggravated murder conviction, (2) that testifying to facts consistent with McPhail's testimony would implicate him in the murder-for-hire plot, *91 subjecting him to criminal liability with a possibility of the death penalty, and (3) that testifying against another inmate would put him in jeopardy of being killed at OSP or another correctional institution. Geer, had he testified, would have contradicted and impeached McPhail's testimony far more effectively than Pope's compromised testimony. As the post-conviction court expressly found, "inmate witnesses create inherent difficulties for lawyers * * *." Geer presented none of those inherent difficulties.
Finally, we address the post-conviction court's conclusion that, even if the murder-for-hire theory had been discredited, it is "quite a stretch" to conclude that the jury would not have found that petitioner had the requisite intent to convict him of aggravated murder. That conclusion was based primarily on the physical evidence of the killing-the fact that petitioner pushed the shank almost five inches into Davis's back with such force that it lifted the victim to his *321 toes. For the following reasons, we conclude that defense counsels' failure to discredit the murder-for-hire theory prejudiced petitioner.
To begin with, we agree with the post-conviction court that the murder-for-hire theory was "at the heart" of the state's case and that there "is no question but that the [prosecution] relied heavily on McPhail's testimony." The state included the theory in both its opening and closing arguments, going so far to assert in its rebuttal to petitioner's closing argument that petitioner
"has assailed, and I expected him to do so, Kenneth McPhail. Why wouldn't you? Because it lays out the most compelling evidence of the plan that was executed by [petitioner]. And because I think jurors, when they make tough decisions, demand evidence and demand that there is physical evidence and witnesses to corroborate or support one another."
Further, the importance of the theory to the state's case is confirmed in the positions it took on petitioner's direct appeal, and that the Supreme Court described the facts of the fatal stabbing in a way that suggests that the murder-for-hire theory was instrumental to the state's case. See Cox , 337 Or. at 480-81, 98 P.3d 1103. Specifically, the court observed that testimony concerning the murder-for-hire plot "bore directly on [petitioner's] intent -the primary issue in the guilt phase." Id . at 494, 98 P.3d 1103 (emphasis added).
We also note that the jury was called upon to evaluate a killing inside the state penitentiary, in which petitioner, the victim, and many of the witnesses were inmates. The state sought to establish motive as a critical part of its case. The factual context for motive would likely be unfamiliar to jurors, who were called upon to assess the credibility of inmate witnesses.
Further, the state's other theory for why petitioner's killing of Davis was intentional-that Davis threatened petitioner, owed him money, and disrespected him, and, therefore, that petitioner, in accordance with the "code of the con," had to retaliate by killing Davis-was not uncontroverted. Inmate witnesses described Davis as untrustworthy, a "maggot," "scandalous," and dangerous, and petitioner *322 adduced evidence and argued at trial that the "code of the con" explained why petitioner could not go to prison authorities to report Davis and, therefore, had to resort to handling Davis's threatening behavior himself. Petitioner also adduced evidence that, if Davis was injured from a stabbing, no one would report him and Davis would be transferred out of OSP. Moreover, a forensic pathologist testified that the stabbing was a single stab and that it is an extraordinarily rare event for a single stab into the back to result in a fatality. Given the ambiguity of the conflict between petitioner and Davis, evidence of Davis's poor reputation, and the forensic evidence of the stabbing, we cannot conclude that there is not more than a mere possibility that the morally and factually unambiguous murder-for-hire theory provided the jury the pathway to find that petitioner intentionally killed Davis. The post-conviction court erred in concluding otherwise.
In sum, we conclude that defense counsel failed to investigate McPhail's murder-for-hire theory and that, had counsel done so, they would have called Geer to contradict McPhail's claims that he was the "war chief" and that the club would have hired a nonmember to murder another inmate. Moreover, petitioner was prejudiced by defense *92 counsels' deficient performance. Accordingly, defense counsels' representation of petitioner was constitutionally inadequate under Article I, section 11.
Reversed and remanded with instructions for post-conviction court to grant relief on aggravated murder conviction; otherwise affirmed.

The issues addressed in this appeal do not concern petitioner's conviction for possessing a weapon by an inmate in a correctional institution, ORS 166.275.

For a more detailed recitation of the facts, see Cox , 337 Or. at 479-82, 98 P.3d 1103.

The evidence to support petitioner's manslaughter theory included, among other things, (1) testimony by a prison supervisor and a retired prison superintendent, who explained the "code of the con" and the circumstances in which inmates are transferred to other correctional facilities or placed in administrative segregation; (2) a pathologist who testified that a stab wound in the back that reaches the aorta is rare and that the odds of a single stab in the area in which Davis was stabbed as being fatal were extraordinarily rare; (3) inmates who testified that Davis was held in low regard at OSP and that Davis threatened petitioner with a shank.

In its closing argument, the state argued, "[D]oesn't it make sense that a man who's burning the candle at both ends, according to * * * McPhail, * * * Davis, will not be tolerated, and that the generous compensation of $ 5,500 in drugs to [petitioner] is such a motivation to do the job[? Petitioner] was motivated by payment in drugs, and he was not getting paid to simply poke him for something that you can cover with a Band-Aid."

Given our disposition, we need not reach petitioner's other assignments of error involving claims of inadequate assistance of counsel, and we reject without written discussion petitioner's remaining assignments of error.

The court found credible the prosecutors' denials that they had presented perjured testimony and found that the matters raised in the motion had been presented to the jury at trial.

The record appears to support a factual finding that investigators interviewed those witnesses with petitioner's manslaughter defense in mind but does not support a finding that the investigators-or defense counsel-ever inquired of those inmates what they knew about McPhail's murder-for-hire theory or, more specifically, McPhail's role in the Lakota Club.

Petitioner also asserts ineffective assistance under the federal constitution. We resolve his claims under the state constitution and, therefore, do not analyze the issues here under the federal constitution. Lichau v. Baldwin , 333 Or. 350, 358-59, 365 n. 3, 39 P.3d 851 (2002). In any event, the two analyses are "functionally equivalent." Montez , 355 Or. at 6-7, 322 P.3d 487.

We refer to defendant, the superintendent of OSP, as "the state" for ease of reference. See Richardson , 362 Or. at 255 n. 1, 406 P.3d 1074.

Defense counsel, in support of the defense's manslaughter theory, called two prison officials to testify about "the code of the con" and that inmates who are assaulted are often transferred to other correctional facilities for their protection.

Although we conclude that it is likely that Geer would have been called as a witness to refute McPhail's testimony, it is also possible that, had defense counsel conducted an investigation into McPhail's claims, counsel would have decided that there was an advantage to calling multiple Lakota Club members to contradict McPhail's claims.